HILLSBOROUGH.

---

STATE (*ex rel. Rhodes & a.*) *v.* SAUNDERS.

In a proceeding under *c.* 77, Laws of 1887, for an injunction against an alleged liquor nuisance, the defendant is not entitled to a jury trial as matter of constitutional right; but, the only question being the existence of the alleged illegal use, that issue may properly be determined by a jury.

A petition under *c.* 77, Laws of 1887, cannot be maintained unless the alleged illegal use exists at the time of the filing of the petition.

IN EQUITY. Petition of twenty legal voters of Manchester, under *c.* 77, Laws of 1887, for an injunction against an alleged

liquor nuisance.   In this and thirty-three similar cases, the following questions were reserved: (1) The constitutional validity of the statute under which the proceedings are brought.   (2) The defendant's right to a trial by jury.   (3) The necessity of proving that the alleged nuisance existed upon the day of the filing of the petition.

[COPY OF THE STATUTE.]

An Act to Authorize the Suppression of Common Nuisances by Courts of Equity.

SECTION 1. Any building, place, or tenement, in any town or city that is resorted to for prostitution, lewdness, or illegal gaming, or that is used for the illegal sale or keeping for sale of spirituous or malt liquors, wine, or cider, is declared to be a common nuisance.

SECT. 2. The supreme court shall have jurisdiction in equity, upon information filed by the solicitor for the county or upon petition of not less than twenty legal voters of such town or city setting forth any of the facts contained in section 1 of this act, to restrain, enjoin, or abate the same, and an injunction for such purpose may be issued by said court or any justice thereof.

*W. L. Foster* and *J. P. Bartlett* (with whom were *J. H. Andrews, D. F. O'Connor, S. D. Lord, W. Little,* and *A. R. Simmons*), for the defendant.   By Laws of 1887, *c.* 77, any building, place, or tenement that is used for the illegal sale or keeping for sale of spirituous or malt liquors, wine, or cider, is declared to be a common nuisance; and jurisdiction in equity is conferred on the supreme court to restrain, enjoin, and abate the same, upon information filed by the solicitor, or upon petition of twenty legal voters.   The title of the reserved case does not determine nor affect the legal character of this proceeding.   It is not an "information," nor a public proceeding in behalf of the state, but it is a private and personal petition in equity; and the question is presented, Are the defendants, in this and similar cases, constitutionally entitled to jury trial of any fact alleged in the petitions? Article 20 of the New Hampshire Bill of Rights declares that "In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, and except in cases in which the value in controversy does not exceed one hundred dollars and title of real estate is not concerned, the parties have a right to trial by jury; and this method of procedure shall be held sacred, unless, in cases arising on the high seas and such as relate to mariners' wages, the legislature shall think it necessary hereafter to alter it."

It will be conceded that the right of jury trial in cases of this kind must be "held sacred," unless it can be shown that in sim-

ilar cases a different method of procedure was "used and prac-
tised" in New Hampshire (not elsewhere) prior to the adoption
of the state constitution of 1792. The exception in article 20 of
the Bill of Rights relates to local use, law, and practice in this
state at the time of the adoption of the constitution. Article 15
of the Declaration of Rights in Massachusetts is expressed in
language substantially identical with that of our article 20; and
in that state the exception has been construed with reference to
the use and practice *there*, and not in England or in other Amer-
ican states, where the widest diversity of practice prevailed when
our constitution was adopted. *Charles River Bridge* v. *Warren
Bridge*, 7 Pick. 344, 368; *Shirley* v. *Lunenburg*, 11 Mass. 379,
385; *People* v. *Justices*, 74 N. Y. 406. The burden must be cast
on the petitioners to bring these cases within the exception, be-
cause "In all controversies concerning property, and in all suits
between two or more persons," trial by jury is the general rule.
Article 20 is expressed in no ambiguous language: "Nothing could
more explicitly declare the intention of the people, that, with the
exceptions therein contained, the right of trial by jury should
never be invaded." *Parker*, C. J., in 7 Pick. 368, before cited.
The question is therefore historical; and we assert that in 1792
there was not and never had been a remedy provided by law or
practice, by petition or complaint in equity, by private citizens, for
the restraint or abatement of an existing and established common
or public nuisance, but the only remedy known to the practice of
our fathers was a public proceeding in the name and behalf of the
state, in which proceeding the right of jury trial was expressly
granted, and was always "held sacred" and unquestioned.
Whether or not a preventive remedy by injunction to restrain
the erection or creation of a nuisance, and whether or not a tem-
porary injunction to restrain an alleged existing nuisance until
the fact may be ascertained by jury trial, existed or exists, are
not questions now presented.

By the Province Laws of 1680 it was enacted "y[t] all tryalls,
whether capitall, criminal, or between man and man, both respect-
ing meritine affairs as well as others, be tryed by a jury of 12
good and lawfull men, according to the good & commendable cus-
tome of England, except the ptie or pties concerned doe refer it to
the bench   .   .   .   .   or the tryall of some other court where jury
is not, in w[ch] case any ptie agreived may appeale, and shall have
tryall by a jury." 1 Prov. Papers, 395. The judiciary act of 1692
established a quarterly court of sessions and a supreme court, and
enacted that "no person's Right of property shall be by any of the
aforesaid courts determined   .   .   .   unless the fault be found by
the Verdict of Twelve men of the neighborhood, as it ought of
Right to be by the Law." The same act established a high court
of chancery, with "power to hear and determine all matters of
equity." 3 Prov. Papers 184–186.

But whatever may have been the extent of the equitable juris-
diction thus conferred upon the high court of chancery, it did
not embrace matters of public nuisance, as we shall presently see.
And down to the time of the adoption of the constitution of 1792,
"all tryalls . . . between man and man" were "tryed by a
jury of 12 good and lawfull men, according to the good & com-
mendable custome of England," unless in cases where parties
elected a tribunal where "jury is not," with right of appeal to a
tribunal where jury trial might be had. No recognized excep-
tions to the right of jury trial existed prior to 1792, unless in some
cases cognizable by the high court of chancery; and the same act
which created that court provided also that no person's right of
property should be determined, "unless the fault be found by the
verdict of Twelve men." But in 1718 the provincial legislature
undertook to establish the procedure in relation to common nui-
sances by an act relating to "Slaughter-Houses for killing of Meat,
Still-Houses, and Houses for the Trying of Tallow, and Currying of
Leather to become a Nusance, by reason of offensive and ill Stenches
proceeding from the same, or otherwise hurtful to the Neighbour-
hood." In such cases it was made lawful for the court of general
sessions of the peace "to cause inquiry to be made therein by a
Jury, and to suppress such Nusance by prohibiting, and restraining
the further use thereof for the exercise of either of the aforesaid
Trades, or Mysteries . . . or any other Nusance to be in-
quired of in manner aforesaid." Prov. Law (ed. of 1726), *p.* 63.
The remedy by indictment is not superseded by the statute, nor
taken away by implication. *State* v. *Wilson,* 43 N. H. 415, 418.
"It would be trifling with the constitution to hold that by chang-
ing the forms of procedure the substantial rights declared by it
can be taken away. In all controversies which are within the
purview of that article of the declaration of rights, the method of
procedure of a trial by jury must be held sacred, whatever the
other forms of procedure may be." *Powers* v. *Raymond,* 137
Mass. 483, 486; *Merchants' Nat. Bank* v. *Moulton,* 143 Mass. 543,
545. And the remedy by indictment, with trial by jury, is suffi-
cient, for, the fact being found, abatement of the nuisance may
then follow. 1 Bish. Cr. L., *s.* 1079. So, also, in proceed-
ings *in rem,* under our forfeiture laws (G. L., *c.* 109, *s.* 29),
issues are joined and verdicts rendered according to the rules
applied in the trial of civil cases. *State* v. *Barrels of Liquor,* 47
N. H. 369; *State* v. *Tufts,* 56 N. H. 137, 138. We are aware
that in *Bellows* v. *Bellows,* 58 N. H. 60, it is said,—"In proceed-
ings in equity the parties have no constitutional right of trial by
jury"—"only this, and nothing more"—citing *Copp* v. *Henniker,*
55 N. H. 179, and *Perkins* v. *Scott,* 57 N. H. 55. But we cannot
suppose the court intended to announce this doctrine without qual-
ification, and as applicable to every case of equitable jurisdiction.
It is true as applied to equity cases in general, but not in partic-

ular.   The statement must have been intended to apply to cases coming within the constitutional exception, if it be a fact that there were, prior to 1792, cases in equity in which jury trial was used and practised.   And that jury trial was " used and practised " in the English courts of equity prior to our constitution, in cases of public nuisances, we presume will not be denied.   Thus it is said, " In cases of public nuisance, properly so called, an indictment lies to punish the offenders.   But an information also lies in equity to redress the grievance by way of injunction.   The instances of the interposition of the court, however, are (it is said) rare, and principally confined to informations seeking preventive relief.   .   .   .   But the question of nuisance or not must, in cases of doubt, be tried by a jury, and the injunction will be granted or not, as that fact is decided."   2 Sto. Eq. Jur., s. 923; *Attorney-General* v. *Cleaver*, 18 Ves. 217, 218; *Attorney-General* v. *Railroad*, 3 N. J. Eq. 136, 142.   Moreover, we have seen that in this state the use and practice of jury trial in cases of public nuisance was prescribed by the statute of 1718.

The equity jurisdiction conferred in cases of nuisance by Gen. Stat., c. 190, s. 1 (G. L., c. 209, s. 1), is not exclusive, and if it was so intended it could not avail to destroy a constitutional right.   And we do not understand that the cases cited in *Bellows* v. *Bellows* sustain the unqualified proposition stated in the opinion. The substance of the decision in *Copp* v. *Henniker* is, that no constitutional objection exists to what is called a compulsory arbitration, "if a reasonably unfettered right of appeal is allowed to a court where the constitutional right in its entirety can be enjoyed."   *Copp* v. *Henniker*, 55 N. H. 179, 202, 203.   And in *Perkins* v. *Scott*, while the historical inquiry failed to establish the practice of jury trial in matters of account prior to 1792, the only question decided was, that if such practice existed the provisions of Gen. Stat., c. 212, making an auditor's report evidence in a jury trial, were not in violation of the constitution.   Therefore *Bellows* v. *Bellows*, if predicated upon these two cases, cannot be so construed as to hold that if, in cases of nuisance, the law or the practice before 1792 gave a jury trial, it can be taken away by a statute conferring equity jurisdiction of such matters.   Nor do we understand that such cases as *Marston* v. *Brackett*, 9 N. H. 336, 349, *Hoitt* v. *Burleigh*, 18 N. H. 389, *East Kingston* v. *Towle*, 48 N. H. 57, 63–65, and the *Opinion of the Justices*, 25 N. H. 537, are overruled or in any way qualified by the case of *Bellows* v. *Bellows*.

Upon the point now under discussion, we do not understand that the doctrine for which we contend is denied in *Mugler* v. *Kansas*. It is there asserted that jury trial is not required in suits in equity brought to abate a public nuisance.   The court were considering the constitution of Kansas, not the constitution of New Hampshire. The Kansas Bill of Rights, s. 5, declares that " the right of trial by

jury shall be inviolate in those cases only where the right existed at common law." *Kimball* v. *Connor*, 3 Kan. 414, 432; *Ross* v. *Commissioners*, 16 Kan. 411, 418. And if at common law jury trial was not required in Kansas in cases of nuisance, the statute of Kansas of March 7, 1885, *s*. 13, was not in conflict with the constitution. But it would be manifestly different with regard to the constitutionality of our statute of 1887, if it be true that prior to 1792 jury trial, in cases of common nuisance, was used and practised either under the common law or by force of the statute of 1718. The one statute would be constitutional, the other not. But in *Mugler* v. *Kansas* the court also say,—"The statutory direction that an injunction issue at the commencement of the action is not to be construed as dispensing with such preliminary proof as is necessary to authorize an injunction pending the suit. . . . Here the fact to be ascertained was, not whether a place, kept and maintained for purposes forbidden by the statute, was, *per se*, a nuisance—that fact being conclusively determined by the statute itself—but whether the place in question was so kept and maintained. If the proof upon that point is not full or sufficient, the court can refuse an injunction, or postpone action until the state first obtains a verdict of a jury in her favor. In this case, it cannot be denied that the defendants kept and maintained a place within the statutory definition of a common nuisance." The defendants admitted every fact necessary to maintain the suit, if the statute under which it was brought was constitutional. *Mugler* v. *Kansas*, 123 U. S. 623, 673, 674. To our minds it is not entirely clear what the court mean by these seemingly loose statements. But it seems that they would at least be reluctant to grant a *permanent* injunction without jury trial unless proof of the fact were so full and sufficient as to amount substantially to an admission. However that may be, it seems to us that there is such a wide difference between the constitutional provisions of the two states, and the use and practice in the two states prior to the adoption of their constitutions, that the interpretation of the Kansas constitution is not relevant to the present inquiry. There is one quite important distinction between the Kansas case and this, at any rate. While in both states the question whether a place maintained for purposes forbidden by the statute is a nuisance is conclusively determined by the statute itself, in Kansas the maintenance of the place by the defendant was admitted; but here it is denied, and the defendant asks that "the fault be found by the verdict of twelve men, as it ought of right to be by the law," that is to say, the use and practice established by ancient statute.

As we have hereinbefore stated, our contention is, that at the time of the adoption of the constitution there was not and never had been any remedy by private suit or petition for the suppression of a common or public nuisance, the only remedy being a proceeding in behalf of the state, in which proceeding trial by jury

was had as a matter of undoubted right. This view is confirmed by reference to the statute of 1718 conferring upon the court of general sessions authority to enjoin and abate nuisances, but not without "inquiry to be made therein by a jury." Perhaps an exception was recognized in the English courts with regard to cases of purpresture, or an encroachment upon the soil or the ease- ments of the crown; but in cases of public nuisance, strictly so called, although a remedy by information in equity as well as by indictment existed, the former remedy was rarely resorted to, and only by way of temporary suppression pending an action at law or an issue sent to a jury. Sto. Eq. Jur., *ss.* 921–924 *a;* Wood Nuis., *s.* 777. In 2 Johns. Ch. 382 it is said (by Chancellor *Kent*, in 1817), that the equity jurisdiction in cases of public nuisance, in the only cases in which it has been exercised, that is, in cases of encroachment on the king's soil, had lain dormant for a century and a half, that is, from Charles I down to the year 1795, three years later than the adoption of our constitution. So late as 1835, Lord *Brougham* remarked that "it is always to be borne in mind that the jurisdiction of this court over nuisance by injunction at all is of recent growth, has not till very lately been much exercised, and has at various times found great reluctance on the part of the learned judges to use it, even in cases where the thing or the act complained of was admitted to be directly and immediately hurtful to the complainant." *Ripon* v. *Hobart,* 3 Myl. & K. 169. And this court has recently said,—" It is a general rule, that equity will interfere by injunction only in cases of an admitted or legally adjudged right in the plaintiff, admitted or legally adjudged to be infringed by the defendant. The existence of the right, and the fact of its infringement, if dis- puted, must be tried in a court of law." *Perkins* v. *Foye*, 60 N. H. 496, and cases cited. And in all these cases, we submit, the remedy by indictment or other action at law, as provided by Gen. Laws, *c.* 109, *ss.* 13–16, 18–29, 34, 35, is abundantly adequate for the complete suppression of a liquor nuisance.

We are not contending that a statute may not determine that to be a nuisance which was not a nuisance at common law; nor that, in cases of emergency, a temporary injunction may not be employed to restrain the mischief. But no emergency would seem to justify a court of equity in permanently abating an alleged nui- sance of the character here complained of, without inquiry by a jury concerning the fact whether the building, place, or tenement is used for the purposes which are said to make it a nuisance, and so used by the defendant.

The statute of 1887 undertakes to give a court of equity juris- diction of a public nuisance upon the complaint of private parties sustaining no special damage. In this respect the use and practice was otherwise prior to 1792, and has been ever since. And if by this change of procedure the right of jury trial is taken away, the

method of procedure by private petition is unconstitutional. For no rule is more clearly established than that no person can maintain an action to suppress a common nuisance unless he sustains a special damage therefrom, different from that sustained by the rest of the public. Or, to state the proposition in the form in which it is usually stated in the cases, " No person can maintain an action for damage from a common nuisance, where the injury and damage are common to all." The individual complaining (and the same must be true of twenty individuals) must make out a clear case of special damages to himself, apart from the rest of the public, and of a different character, so that they cannot fairly be said to be a part of the common injury resulting therefrom. Wood Nuis., ss. 645, 646; High Inj., s. 522. " Unless the party shows that he has sustained, and is still sustaining, individual damage, he cannot be heard." *Miss. & Mo. R. R. Co.* v. *Ward,* 2 Black 485, 492; *Georgetown* v. *Alexandria Canal Co.,* 12 Pet. 91, 97–99; *Irwin* v. *Dixion,* 9 How. 10. In the case last cited, it is said that even in cases of "great, continued, and irreparable injury . . . . cases where an action at law would yield too tardy and imperfect redress, . . . no remedy whatever exists . . . . by an individual, unless he has suffered some private, direct, and material damage beyond the public at large, as well as damage otherwise irreparable." And see *Bowden* v. *Lewis,* 13 R. I. 189. *Houck* v. *Wachter,* 34 Md. 265, *S. C.,* 6 Am. Rep. 332, 335, *Blackwell* v. *Old Colony R. R.,* 122 Mass. 1, *Rogers* v. *Elliott,* 146 Mass. 349–351, and *Dover* v. *Portsmouth Bridge,* 17 N. H. 200, 215, 216.

*R. M. Wallace, Solicitor,* and *Samuel Upton,* for the state, cited and commented upon Bish. Cr. L., ss. 84, 150 a, 349, Bish. Stat. Cr., ss. 138, 193 n., 200, 873, *State* v. *Fletcher,* 5 N. H. 257, *Copp* v. *Henniker,* 55 N. H. 210, *Perkins* v. *Scott,* 57 N. H. 81–84, *Bellows* v. *Bellows,* 58 N. H. 60, *Mugler* v. *Kansas,* 123 U. S. 623, 2 Sto. Eq. Jur., ss. 623, 862, 924, *Ford* v. *Burleigh,* 60 N. H. 279, *Milan Steam Mills* v. *Hickey,* 59 N. H. 242, *Winnipesaukee Association* v. *Gordon,* 63 N. H. 505, and *Rindge* v. *Sargent,* 64 N. H. 294.

*James W. Remick,* who appeared in behalf of the Littleton Law and Order League, orally for the state. The power of the legislature to regulate, restrain, and, if necessary, to prohibit and destroy, whatever is injurious to the public health and morals, or whatever is offensive to the public sense, is universally recognized, and nowhere more distinctly than in New Hampshire. *State* v. *Noyes,* 30 N. H. 279; *State* v. *Marshall,* 64 N. H. 549; *State* v. *Campbell,* 64 N. H. 402; *State* v. *Freeman,* 38 N. H. 426; *State* v. *Clark,* 28 N. H. 176; *Train* v. *Company,* 144 Mass. 523; *Mugler* v. *Kansas,* 123 U. S. 623; *Kidd* v. *Pearson,* 128 U. S. 1, 16. *State* v. *Noyes* is a case directly in point. There the legis-

lature undertook to declare bowling alleys, within certain limits, common nuisances. The act was sustained, and the authority of the legislature in the premises was recognized to the fullest extent. In *Train* v. *Company* the court said "there can be no doubt of the right of the legislature to pronounce, under its police power, certain things or certain acts nuisances in themselves. Nor are such laws obnoxious to any constitutional provision, because they do not provide compensation to the individual whose liberty to keep or do them is restrained. It may forbid entirely the exercise of certain trades noxious or offensive, or trades which it holds to be such, or permit it under such safeguards as it may prescribe. . . . . It may determine when that which is otherwise property shall cease to be such, if kept contrary to law." In *Kidd* v. *Pearson,* Justice *Lamar,* delivering the opinion of the court, said it was established by *Mugler* v. *Kansas,* 123 U. S. 623, that a state legislature has the constitutional "right to prohibit or restrict the manufacture of intoxicating liquors within her limits; to prohibit all sale and traffic in them in said state; to inflict penalties for such manufacture and sale, and to provide regulations for the abatement as a common nuisance of property used for such forbidden purposes; and that such legislation by a state is a clear exercise of her undisputed police power, which does not" deprive persons of their property, immunities, privileges, etc., without due process of law.

Section 2 provides that "The supreme court shall have jurisdiction in equity, upon information filed by the solicitor for the county or upon petition of not less than twenty legal voters of such town or city setting forth any of the facts contained in section 1 of the act, to restrain, enjoin, or abate the same, and an injunction for such purpose may be issued by said court or any justice thereof." For more than three hundred years, independent of any statute, the enjoining of common nuisances, on information by some one representing the public, has been an established branch of equity jurisdiction. It is supported by a chain of precedents extending back to the time of Elizabeth. *Bond's Case,* Moore 238; *Anon.,* 3 Atk. 750; *Attorney-General* v. *Richards,* 2 Anst. 603; *Mayor* v. *Bolt,* 5 Ves. 129; *Attorney-General* v. *Cleaver,* 18 Ves. 211; *Crowder* v. *Tinkler,* 19 Ves. 617; *Attorney-General* v. *Johnson,* 2 Wils. Ch. 87; *Attorney-General* v. *Forbes,* 2 Myl. & C. 129; *District Attorney* v. *R. R. Co.,* 16 Gray 245; *Attorney-General* v. *Railroads,* 35 Wis. 533; *State* v. *Mobile,* 5 Por. 279; *Mugler* v. *Kansas,* 123 U. S. 623; *State* v. *Crawford,* 28 Kan. 726; *Littleton* v. *Fritz,* 65 Iowa 488; *Attorney-General* v. *R. R. Co.,* 3 N. J. Eq. 136; *Attorney-General* v. *Hunter,* 1 Dev. Eq. 13; *Penn.* v. *Bridge Co.,* 13 Howard 518; *Mayor* v. *Canal Co.,* 12 Pet. 91; *Attorney-General* v. *Blount,* 4 Hawks 384; *People* v. *Davidson,* 30 Cal. 379; *State* v. *Saline,* 51 Mo. 381; *Coker* v. *Birge,* 9 Ga. 425. All the great equity commentators, both English and American, declare it broadly and

unqualifiedly.   Sto. Eq. Jur., *ss.* 921–923 ; Dan. Ch., *c.* 36, *p.* 1636;
Pom. Eq. Juris., *s.* 1349; Ad. Eq. 211; Fonbl. Eq. 4; Kerr Inj.
334; High Inj., *ss.* 520, 521; *Coker* v. *Birge*, 9 Ga. 398.

[Counsel here quoted from and commented at length upon the
authorities cited.]

The second section of the statute is merely declaratory of an
ancient jurisdiction, firmly established upon authority, necessity,
and reason.   The only innovation it introduces respects the mode
of instituting the proceeding.   It authorizes twenty legal voters
to apply for the injunction, in addition to the old method of
information by the state's attorney.   No one will contend, if the
jurisdiction exists, that the legislature cannot prescribe the agency
through which it shall be sought.   The fact that it has always
been through the attorney-general, does not make him the exclu-
sive medium for the purpose.   The legislature which created the
office of attorney-general and prescribed its duties, may, in the
exercise of the same power, create supplemental agencies to share
its authority.   The power of the legislature in this particular has
been repeatedly sustained.   Thus, in *Littleton* v. *Fritz*, 65 Iowa
488, the court said,—"There can be no doubt that it is within the
power of the legislature to designate the person  . . . .  who
may maintain actions to restrain and abate public nuisances, and
when that is done the action is for all purposes an action insti-
tuted in behalf of the public, the same as though brought by the
attorney-general or public prosecutor."   In *Carleton* v. *Rugg*, 149
Mass. 550, 554, the court said,—"There can be no doubt of the
constitutional right of the legislature to prescribe the agency to
represent the public in setting the law in motion, that may as well
be ten legal voters of the town where the nuisance exists, as the
attorney-general, if the legislature so determines."   From this
proposition there does not appear to have been any dissent.

The defendant contends that since the act of maintaining a
liquor saloon is a crime, it cannot be the subject of equity juris-
diction.   As a crime, and for the purpose of punishment, courts
of equity have and can have no jurisdiction of the rum-shop.   But
of the saloon as a nuisance, and for the purpose of restraint and
prevention by the process of injunction, the jurisdiction of courts
of equity is certain and in no way affected by the fact that the
maintenance of the saloon is also a crime.   Mr. Bishop, in his work
on Criminal Procedure, *vol.* 1, *s.* 1415, states the principle as fol-
lows: "Equity will not, by injunction, restrain one from committing
crime.   But if an injunction is proper on other grounds, the mere
fact that the act enjoined is criminal will not prevent its issuing."
Mr. High, in his work on Injunctions, *s.* 524, says,—"A com-
mon nuisance may be enjoined in behalf of the public,—though an
indictment is pending for the same offence."   All the text writers
who have had occasion to treat the subject have reached the same
conclusion.   The reported cases, which are numerous and well con-

sidered, uniformly sustain the jurisdiction. *State* v. *Crawford*, 28 Kan. 726; *Littleton* v. *Fritz*, 65 Iowa 488; *Carleton* v. *Rugg*, 149 Mass. 550; *Hamilton* v. *Whitridge*, 11 Md. 128. I know of but one case where the position of the defendant seems to be sustained, and that is *Attorney-General* v. *Ins. Co.*, 2 Johns. Ch. 370, which has been frequently criticised and rejected in other jurisdictions, and disregarded, in New York, without comment, from deference, we presume, to the chancellor who decided it.

But, independent of authority, why should the court of equity lose its jurisdiction merely because the act which constitutes the nuisance is itself so vicious as to be declared a crime? Consider the application of such a doctrine. Chapter 111, *s.* 10, of the Gen. Laws provides that "If any person shall use or occupy any building in the compact part of any town for a slaughter-house, for trying tallow, or for currying leather, or for the deposit of green pelts . . . . he shall incur a penalty of ten dollars for each month in which the said building shall be so occupied." Does this act, making the maintenance of a slaughter-house in the compact part of any town a crime, take away the preventive jurisdiction of the court of equity? For ten dollars a month must a community submit to the foul, offensive, and disease-producing stench of a slaughter-house? Chapter 111, *s.* 11, provides that "If any person shall erect or continue any house of easement or privy within forty feet of any street . . . . unless the same is vaulted six feet deep and sufficiently secured and enclosed, or shall erect or keep any pen or stye for swine so . . . . as to be a nuisance, he shall incur a penalty of ten dollars, and a like penalty for each month he shall continue the same." By this act, making these things a crime, does the court of equity lose its jurisdiction to restrain them?—for ten dollars a month can a privy and a pig-pen be made of a public highway or sidewalk? By *s.* 4, *c.* 274, fornication is made a crime. For this reason are houses of prostitution put out of the preventive jurisdiction of courts of equity? The principle for which the defendant contends would not merely defeat this act and the power of equity to enjoin saloons, but would exempt every kind of common nuisance from this salutary jurisdiction. All common nuisances are crimes. As was said in *State* v. *Crawford*, *supra*,—"At common law all public nuisances were public offences; and if the proposition is sound, that no nuisances can be enjoined except such as are not public offences, then where the common law has full force no public nuisance could ever be enjoined."

Article 15 of the Bill of Rights is but a reënactment of the liberty clause of Magna Charta, guaranteeing, as Mr. Hallam has said, the liberty and property of free-men from arbitrary imprisonment and spoliation. 2 Hall. Mid. Ages 327. In some form, says Judge Cooley (Con. Lim. 439, 6th ed.), "it is to be found in each of the state constitutions, and though verbal differences appear in the different provisions, no change in language, it is thought,

has in any case been made with a view to essential change in legal effect." Is it not strange, if there is anything in this historic guaranty opposed to the jurisdiction we are discussing, that it has not been earlier declared? If the power to enjoin public nuisances is denied to courts of equity by Magna Charta and all the American constitutions, is it not remarkable that the jurisdiction has flowed on down the centuries of English jurisprudence, and that it has been established in nearly every state of the Union?

So much of article 15 as relates to proceedings in criminal cases has no application here. Cases under this statute are not criminal, but civil. It is not the act which gives rise to legal proceedings that is to determine their civil or criminal character, but the object of the proceedings themselves. A thing may be criminal, and yet be the subject of civil proceedings. For instance, a man wilfully burns my house: this is a crime;—but I may sue him for damage, and the action is civil, because the object of the suit is civil. A man sells liquor to my servant, who, in the rashness or the stupidity of intoxication, burns my house: the sale of the liquor is a crime;—but I may sue the seller for civil damage, and the action is civil, and regulated by civil rules of procedure, because the object is civil. Nobody ever pretended, so far as I know, that these proceedings, with their fishing depositions, and other incidents of civil trial, were in violation of any provision of the constitution, because the act which gave rise to them was criminal. On the contrary, Bishop, in his work on Criminal Law, *vol.* 1, *ss.* 264, 265, says the general doctrine is, that "a private person and the state may severally carry on, the one a civil suit and the other a criminal prosecution, simultaneously, for the same act of wrong, if both have suffered from it." "An action for assault and battery, or for the recovery of damages done by a common nuisance, may proceed at the same time with the indictment for the same thing." And, as stated by Bishop in his work on Criminal Procedure, *vol.* 1, *s.* 1413, "As the same facts on which an indictment proceeds may be the subject of a common-law action, so also they may be of a suit in equity." Nor is this right to civil proceeding limited to private individuals who have sustained injuries distinct from the state; but the state itself is entitled to a civil remedy in addition to its criminal remedy, to accomplish any allowable civil object. In *State* v. *Barrels of Liquor*, 47 N. H. 369, it was urged that since a complaint for forfeiture was based upon a violation of the criminal law, for which the owner was subject to indictment, the proceedings were criminal in nature and governed by criminal regulations. But the court held that as no criminal object was sought by the proceedings,—no fine, no imprisonment,—they must be regarded as civil, and that depositions might be taken as in any civil case.

The point made by the defendant, that, if a court of equity is allowed to take jurisdiction of the saloon for the purpose of in-

junction, it will necessarily, in the exercise of that jurisdiction, prejudge the defendant, according to civil methods, upon a matter for which he may subsequently be called to account in a criminal proceeding, would apply with equal force to private suits at common law for civil damages growing out of a criminal act. Undoubtedly if the two proceedings were pending at the same time, the court might and would, in the exercise of a sound discretion, and from that regard which the law has for those accused of crime, suspend proceedings upon the petition until judgment in the criminal action. But to ask the court wholly to surrender its jurisdiction upon any such consideration is going too far. The principle governing the matter is well stated in a note to Bishop on Criminal Law, vol. 1, s. 266, as follows : " Whether the court, as matter of discretion, will continue one of the cases, and which one, until the other is disposed of, depends on the special circumstances, on the usage of the tribunal, and on what the individual judge may deem best adapted to promote justice." A proceeding by indictment, and a civil suit on account of the same matter or thing, may go on at the same time. All these questions, regarding the power of the legislature to confer upon courts of equity jurisdiction to enjoin the liquor saloon as a common nuisance, have been fully considered by the supreme courts of the United States, of Iowa, and of Massachusetts, under statutes in no material respect different from our own ; and wherever the question has been discussed, the authority of the legislature has been emphatically declared. *Mugler* v. *Kansas*, 123 U. S. 623 ; *Littleton* v. *Fritz*, 65 Iowa 488 ; *Carleton* v. *Rugg*, 149 Mass. 550.

The only fair and reasonable supposition is, when a legislature declares the rum-shop a common nuisance, and provides for its abatement by an injunction in equity, that the purpose is what it is in cases of kindred nuisance,—not to get a new twist upon the public offender who maintains it ; not to get him to jail more summarily ; not to usurp, supplement, or exercise criminal jurisdiction in any way, but simply to put in operation against the impersonal thing we call the saloon, and which the legislature in its wisdom has pronounced a nuisance, the ancient and well established preventive remedy peculiar to the court of equity. The aim is not at the rumseller as a public offender, but at the saloon as a public nuisance. Such is the holding of the courts, where the question has been under consideration.

If this were an attempt to enjoin the illegal act of rum-selling, without reference to place or establishment, the case would stand on different ground. It is one thing to enjoin the act of sale, quite another to enjoin the place of sale. It is one thing to enjoin a man from committing fornication, quite another to enjoin the place where fornication is made a business. It is one thing to enjoin a man from gambling, quite another to enjoin the place where gambling is regularly conducted. The one aims at person ;

the other, place. One seeks to restrain a criminal act; the other, to enjoin the establishment where the act is habitually committed so as to constitute it a nuisance, and then only as a nuisance. In this case, the aim is clearly against the place. The act says that any place, etc., may be enjoined, etc., making no reference to person from beginning to end. But if it were not certain whether the object of the legislature was the constitutional object of enjoining a common nuisance, or the unconstitutional object of punishing the creator of it in equity, the court is bound to presume that the legislature intended the statute to have effect, and, therefore, to find that they were actuated by the constitutional motive.

The defendant says that though the legislature may constitutionally confer upon courts of equity jurisdiction to enjoin liquor saloons, it must be subject to the right of trial by jury of the question whether the place complained of is or is not a place where liquors are illegally sold; and since the act does not expressly give that right, it is in conflict with article .20 of the Bill of Rights. Our first reply to this is, that if such right exists, there is nothing in the act which abridges it. The statute nowhere provides that the injunction may issue without trial by jury. It does not even say, as does s. 1, c. 209, of the Gen. Laws, where all nuisances are made subject to equitable jurisdiction, that the proceedings shall be "according to the course of proceedings in equity." It simply declares that upon petition, etc., the court may enjoin, leaving the manner of hearing and trial wholly unprovided for, and free to be regulated by the court according to every legal and constitutional requirement. A denial of jury trial cannot be implied from the mere want of its express reservation. This might be allowable in the case of the legislature's extending equity jurisdiction over a matter fully and amply provided for by the common law, because then it might be a legitimate presumption that it was the distinctive and summary procedure of the equity court, and not its remedy, that was sought for. But when, as in this case, there is an essential remedy, peculiar to the equity court, which is the manifest object of the act, then we submit there is no possible ground for such presumption. Indeed, the true principle would seem to be that the court can take from or add to an act of the legislature by judicial inference only for the purpose of upholding it, never when the effect would be to defeat it. In this case, since the act fails to designate the mode of trial, it is the duty of the court to presume that the legislature intended a constitutional mode. Cool. Con. Lim. 219 (6th ed.). This principle has been repeatedly declared and acted upon by this court. *Willard* v. *Harvey*, 24 N. H. 344; *Telephone Co.* v. *State*, 63 N. H. 169. But there are authorities even more directly in point on this branch of the case. *Gage* v. *Ewing*, 107 Ill. 11; *Carleton* v. *Rugg*, *supra*. We have numerous statutes conferring equity jurisdiction, and in no case is anything said about jury trial.

These statutes are not for this reason unconstitutional; but if a case arises under them where the parties are entitled to a jury trial, the court will secure it to them in accordance with the provision of our statutes, viz., *s.* 3, *c.* 208, and *s.* 19, *c.* 231, of the Gen. Laws. Conceding, for the present, the right of jury trial, I go so far as to say, that though the legislature had affirmatively declared that every question of fact should be determined by the court, yet you would be bound to sustain the act so far as it declares liquor saloons common nuisances, and so far as it provides for their restraint by the injunctive process. Thus it was held in the case of *East Kingston* v. *Towle*, 48 N. H. 65, where the court said.— "An act may be in part beyond legislative authority, and within it for the residue; and if the act is capable of being administered in the parts which are within the power of the legislature to enact, it will be so far valid." The mode of trial is not of the essence of the nuisance act. Its object is the restraining process of a court of equity.

In proceedings for an injunction against a common nuisance, so declared by statute, there is no constitutional right to a jury trial. It is claimed by virtue of article 20 of the New Hampshire Bill of Rights, which provides, so far as this case is concerned, that "In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, the parties have a right to trial by jury." An attempt has been made to distinguish this provision from the corresponding provisions on the same subject to be found in the other state constitutions. But it is identical with the Maine and Massachusetts constitutions, and differs from the others only in phraseology. What difference is there between saying, as do some of the constitutions, that trial by jury shall remain inviolate, or, as do others, that it shall remain as heretofore used, and saying, as does ours, that it shall remain in all cases except where it had been otherwise before? Are not the spirit and the meaning the same in each case, viz., to continue the right as it had previously existed? Proffatt (Jury Trial, *ss.* 84 and 85) says, in providing for jury trial, " the constitutions of our states use phrases of different degrees of definiteness and description. These phrases may be divided into three classes. First, it is laid down that the right 'shall remain inviolate' . . . . ; secondly, it is provided the right 'shall be inviolate;' and thirdly, others hold more explicitly and expressly that it 'shall be as heretofore used.' But no matter how expressed, whether 'shall be inviolate,' 'shall remain inviolate,' or 'shall be as heretofore,'" the interpretation is the same.

Their identity established, let us now consider their meaning. This involves a variety of considerations. First. Of what time do they speak? They continue the jury trial where it previously existed; but previously is a term as far reaching as the measureless past. It is established, however, that they speak of the time

of their adoption. Proffatt says, ss. 87 and 88, " the interpretation has been uniformly given to the operative clauses of the constitution, however they may be expressed in the three modes already pointed out," that they secure the trial only in cases in which it existed " at the time of the adoption of the constitution." Pomeroy, in the second edition of Sedgwick on the Construction of Statutory and Constitutional Law, p. 487, says, "As a constitution speaks from the time of its adoption, that time must necessarily determine the meaning of the clause which recognizes and preserves jury trial." Second. Of what do they speak? They continue the trial where it previously existed; but "existed" is an indefinite term. Existed where? In France, under the civil law; in England, under the settled and enlightened system of the common law ; or in the province and state of New Hampshire, where chaos, confusion, and arbitrary assumption had characterized the previous administration of justice? On this question counsel are not agreed, nor are the cases entirely so. But I submit that the overwhelming preponderance of authority makes the common law in its English sense the true test. This principle is distinctly declared by Proffatt, s. 87, as follows: "The provision that trial by jury shall remain inviolate does not require every trial to be by jury. Nor does it contemplate that every issue which by the laws and statutes in force at the adoption of the constitution was triable by jury should remain irrevocably triable by that tribunal. Trial by jury is guaranteed only in those cases where that right existed at common law. In chancery proceedings the legislature is fully competent to dispense with the jury." The foregoing is the language used by the court in *Kimball* v. *Connor*, 3 Kan. 414, and is unqualifiedly adopted by the commentator. In *Littleton* v. *Fritz*, so often cited on other branches of this case, the court said,—" The provision that the right of trial by jury shall remain inviolate, or its equivalent, is common to the constitutions of many states of the Union, and it has been held that it secures the right of trial by jury in all cases in the trial of which a jury was necessary, according to the principles of the common law." In *Allen* v. *Anderson*, 57 Ind. 388, it was observed that the provisions of the constitution, that the right of trial by jury "shall remain inviolate," " was adopted in reference to the common-law right of trial by jury." In *Anderson* v. *Caldwell*, 91 Ind. 451, it was claimed that there was a right of trial by jury in proceedings under the drainage act of that state ; but the court said,—" The right which the constitution declares shall remain inviolate is the right of trial by jury as it existed when that instrument was adopted. The right so carefully guarded and preserved is the one transmitted to us from our British ancestors. . . . . We are therefore to look to the common law to ascertain what this right was, and not to particular statutes which may be changed at the pleasure of the legislature."

While there is not perfect harmony in the authorities, I submit that the rule is not otherwise in New Hampshire. In *Pierce* v. *State*, 13 N. H. 557, 558, it was contended that the jury were judges of the law as well as of the fact in criminal cases, because throughout the history of the province, after the Revolution, and subsequent to the adoption of the constitution, until 1830, it was so practised in New Hampshire. But the court held that article 20 of the Bill of Rights, in preserving trial by jury, had reference to that mode of trial as understood and practised at common law. So, in the *Opinion of the Judges*, 41 N. H. 551, and *East Kingston* v. *Towle*, 48 N. H. 64, the court declared that " The trial by jury secured to the subject by the constitution, is a trial according to the course of the common law." It is true, that in *Copp* v. *Henniker* the New Hampshire practice prior to 1792 was made the test. But in the later case, of *Perkins* v. *Scott*, 57 N. H. 80, the same judge modified his former opinion to the extent of saying that the New Hampshire practice could not be regarded if it was arbitrary, and in derogation and defiance of rights established and secured by the British constitution. And in the still later case of *King* v. *Hopkins*, 57 N. H. 334, 347, 350, the opinion in *Copp* v. *Henniker* was further modified with the concurrence of the judge who delivered it. The court said,—" The decision in *Pierce* v. *State*, overturning the uniform practice of the province and state down to a time as late, certainly, as the trial of Corey for murder, in Cheshire county, in 1830, and holding that the constitutional right of trial by jury would be violated by allowing the jury to decide the law, gives little weight to the old practice of unlearned judges in this state, and recognizes that only as a jury trial which was such by the true principles of the common law. . . . The ' sacred right' and ' inestimable privilege,' not conferred but confirmed by the Bill of Rights, was, in the mind and intention of those who declared it, the common-law jury trial in all its essential and time-honored attributes. It is not possible that any other kind of jury trial can be sustained as the true legal construction of the constitution. The authorities are numerous that construe common-law terms in a constitution according to their common-law signification. Our constitution is to be construed in the light of the common law." It may be taken as established in this state, that, so far as concerns the essentials and attributes, the mode and kind of jury trial contemplated by article 20 of the Bill of Rights, the common law, as transmitted by our British ancestors, is the true test, though it conflicts with the New Hampshire practice from the first settlement to the adoption of the constitution.

When the constitution says, as article 20 has been uniformly interpreted, that trial by jury shall continue as and where it existed before, what reason is there for saying that the "as" shall be interpreted in the clear and certain light of the common law, but the "where" shall find its meaning in the haze and mist and chaos of

Provincial and Revolutionary practice? If the inartificial manner of judicial administration in New Hampshire before the constitution is a reason why the precedents of that period should be rejected as a test of how the trial shall be conducted, so, too, it is a reason for rejecting them as a test of where it shall exist; for there was as much defiance and disregard of the settled principles of the common law in the one case as in the other, as is apparent from a slight examination of the judicial history of that period, and as is shown by Mr. Shirley and recognized by Judge *Ladd* in *Perkins* v. *Scott.*

Third. Jury trial is not secured by article 20 in every case, even where it was had at common law, but only in those cases where it was had as a matter of right. Judge Cooley (Con. Lim. 504, 6th ed.) says,—"All the state constitutions preserve the right of trial by jury, for civil as well as criminal cases, with such exceptions as are specified. . . . . The constitutional provisions do not extend the right, they only secure it in the cases in which it was a matter of right before." So, also, says Proffatt, *s.* 87: "however the right may be defined or fixed, the inquiry must be made, as a purely historical fact, when and in what cases it is a matter of right." Pomeroy, in his note to the 2d edition of Sedgwick on Statute and Constitutional Law, reiterates the principle, saying, "It is the right of trial by jury that is preserved." In *Littleton* v. *Fritz, supra,* the court, citing *Isom* v. *R. R. Co.,* 36 Miss. 300, said,—"The provision that the right of trial by jury 'shall remain inviolate,' or its equivalent, is common to the constitutions of many states of the Union, and it has been held that it secures the right of trial by jury in all cases in the trial of which a jury was necessary, according to the principles of the common law." The same principle was unqualifiedly declared by this court in *Copp* v. *Henniker* and *Scott* v. *Perkins.* In the former case, the court observed,—"The guaranty of trial by jury is everywhere construed to secure such jury trial only in cases where it could by law have been claimed as a matter of right at the time the constitution was framed." In the latter case, the court said,—"It is only where jury trial was matter of absolute right before the adoption of the constitution, that it is guaranteed by article 20." The foregoing examination establishes this principle, that jury trial is guaranteed by the several constitutional provisions of which we have been speaking in those cases only where that mode of trial was at the time of their adoption, and according to the common law as understood and practised in the land of its origin and development, a matter of absolute right. The question for us is resolved into this: In England, in 1792, in proceedings for injunction against a common nuisance, declared to be such by statute, was there an absolute right to trial by jury? If so, then the right exists in such cases now; otherwise, not. I submit that there was no such right. Proceedings to enjoin common nuisances

were then and there, as here and now, equitable proceedings for an ancient and purely equitable remedy. In proceedings in equity, in a matter proper for equitable cognizance, while the court has always been at liberty to send questions of fact to a jury for its own enlightenment, there never has been, independent of express statutory or constitutional provision, an absolute right to a jury trial except in two cases, which will hereafter appear, but which are peculiar to the English civilization, and in no way related to the present subject, or applicable to American conditions. On the contrary, it has always been the undoubted prerogative of the equity court, with the exceptions hinted at, to hear and determine for itself every question of fact put in issue upon the record in any matter truly belonging to equity jurisdiction. Dan. Ch. 1072, 1080; Fonbl. Eq. 31, 663–666; Ad. Eq. 375, and note; 1 Spence Eq. Jur. 337; Sto. Eq. Jur., ss. 31, 702, 1464; Prof. Jur., ss. 90, 91; 3 Gr. Ev., ss. 260, 261; 3 Cool. Black. 47, note; O'Connor v. Cook. 6 Ves. 665; O'Connor v. Cook, 8 Ves. 536; Jervis v. White, 7 Ves. 414; Newman v. Milner, 2 Ves. 483; Le Guen v. Gouverneur, 1 Johns. Cas. 36; Smith v. Carll, 5 Johns. Ch. 118; Townsend v Graves, 3 Paige 453; Warden v. Morris, 9 Ves. 168; Dale v. Roosevelt, 6 Johns. Ch. 255; Apthorp v. Comstock, 2 Paige 483; Root v. R'y Co., 105 U. S. 189; Penn. v. Bridge Co., 13 How. 565; Parsons v. Bedford, 3 Pet. 440; State v. Crawford, 28 Kan. 726; Littleton v. Fritz, 65 Iowa 488; Bank v. Cooper, 2 Yerg. 599; Call v. Perkins, 65 Me. 439; Ward v. Hill, 4 Gray 595; Cushman v. Jewelry Co., 76 N. Y. 372; Hudson v. Caryl, 44 N. Y. 555; Curnow v. Hydraulic Co., 68 Cal. 262; Flaherty v. McCormick, 113 Ill. 538; Helm v. Bank of Huntington, 91 Ind. 44; Steamboat v. Roberts, 48 Am. Dec. 188, n.; Tappan v. Evans, 11 N. H. 334; Clark v. Cong. Society, 45 N. H. 337, 338.

[Counsel here quoted from and commented at length upon the authorities cited.]

An attempt has been made to show that proceedings to enjoin common nuisances constituted an exception to the rule. But if there were nothing else, the fact that no English or American text writer, ancient or modern, has recognized such exception, would be conclusive that it never existed. Story, s. 923, has been worn threadbare in the service of those who would establish this exception. But there the commentator simply said that "the question of nuisance or not, must, in cases of doubt, be tried by a jury." Is that the way an absolute right is declared? Is trial by jury, in cases at law where more than one hundred dollars is involved, subject to a preliminary inquiry by the judge as to whether the question at issue is doubtful or not? Does not the fact that the trial is made to depend on such preliminary inquiry prove that Story recognized, as has every other text writer, that it was not a matter of right, but merely of practice and discretion? Furthermore, the

text is predicated upon the case of *Attorney-General* v. *Cleaver*, 18 Ves. 217, 218, which gives no warrant for such exception. As this case is principally relied upon by all who claim jury trial as matter of right in nuisance proceedings, it requires more than passing attention. The injunction there sought was against a soap manufactory, in itself a necessary and legitimate industry. An indictment was pending for the same matter. Lord *Eldon* ordered the motion to stand over until the trial at law, which he took measures to expedite. But his action was manifestly controlled by discretion, and not by any arbitrary rule. He was unwilling, not unauthorized, to interrupt and destroy a large and otherwise legitimate industry, until after it had been condemned at law. He thought there should, not must, under the circumstances, be a trial by jury. It was an application of the rule laid down in Eden on Injunctions, *c.* 11: " That where the alleged nuisance consists in the exercise of a manufacture, the court, upon the same principle upon which it feels so much reluctance to restrain the working of mines and collieries, would require the fact of its being a nuisance to be first clearly established at law." Accordingly the commentator says,—" In the case of *Attorney-General* v. *Cleaver*, the court refused to interfere, partly on account of the inconvenience of stopping a large trading concern in which capital to a great amount had been embarked, and partly on account of the laches of the complainant in asking relief." There is no suggestion of want of jurisdiction; on the contrary, the writer says elsewhere, that " not the least doubt seems to have been raised as to the jurisdiction, and the court refused to interfere for other reasons." In the well considered case of *State* v. *Mobile*, 5 Por. 279, where the present question was under consideration, the court said,— " In *Attorney-General* v. *Cleaver*, Lord *Eldon* did, not deny the jurisdiction of the court, but thought it proper to refuse the injunction until it could be ascertained by trial at law." Excepting a quotation from some old cases in the exchequer, there is nothing in the opinion to support the defendant's contention. On the contrary, the opinion distinctly asserts the court's prerogative in the premises, and declares that discretion is the rule of its action. " Admitting the jurisdiction, the question comes at last very much to this ; whether, if the court may grant an injunction, but ought not, without a trial by jury, I am authorized to interpose by granting an injunction in the interval." The opinion of the same judge, in *Crowder* v. *Tinkler*, reported in the next volume of Vesey, must dissipate any remaining doubt upon the subject. There an injunction was sought against a powder-house, on complaint of a private individual. Lord *Eldon* said,—"As a mere public nuisance, I could not interfere in this case except on the application of the attorney-general, and then this court, generally, would not interfere until a trial at law, unless the case was clearly a public nuisance. The question is, whether upon all the

affidavits the case is so clear that I can sustain this injunction without putting the question in a course of trial; and if there ought to be a trial, whether I ought to sustain the injunction in the interval." It is always "ought not," never cannot; and even the "ought not" is limited to cases of a doubtful and perplexing nature. Both of these decisions by Lord *Eldon*, though negative in character, instead of being against, distinctly recognize, the authority of the court of equity in nuisance, as in other cases of equitable cognizance, to hear and determine every fact put in issue upon the record.

But we are not dependent upon questionable or negative precedents, for there are many early English cases where injunctions were granted against common nuisances without trial at law. Lord *Eldon*, in *Attorney-General* v. *Cleaver*, appears to have thought that there were no such precedents; but in this he was clearly wrong, as has often been declared. In Eden on Injunctions, *c.* 11, we find the following observations upon the subject: " It has been said that there is no instance of the court holding a place a nuisance, and therefore enjoining it, without trial. This proposition, however, it is submitted, is laid down too extensively; for though some orders of Lord *Jeffries*, who on petition restrained persons from proceeding in buildings which would intercept the prospect from Gray's Inn Gardens, may not be considered as authorities, yet in all the cases cited from Lord *Hale* also, and in the modern decisions in the exchequer, which, although purprestures, were also nuisances, the decrees were made without any trial." In *Ripon* v. *Hobart*, Coop. *t.* Br. 333, Lord *Brougham* said,—"Lord *Eldon* at one time [*Attorney-General* v. *Cleaver*] appeared to think that there was no instance of an injunction without trial, but this cannot be maintained." In *State* v. *Bridge Co.*, 13 How. 518, the court said,—"Lord *Eldon*, in the case of *Attorney-General* v. *Cleaver*, appears to have thought that there was no instance of an injunction to restrain a nuisance, without trial, but in this he was clearly wrong." Among the earlier English cases, where the jurisdiction to enjoin without trial was exercised or recognized, we mention *Bond's Case*, Moore 238, *Attorney-General* v. *Burridge*, 10 Price 350, *Attorney-General* v. *Richards*, 2 Anst. 603, *Attorney-General* v. *Forbes*, 2 Myl. & C. 123, and *Attorney-General* v. *Johnson*, 2 Wils. Ch. 87. An attempt has been made to destroy the force of these precedents on the pending question by claiming that they are all cases where the object of the injunction was a purpresture, and that a peculiar rule obtained in such cases.

The distinction between nuisances which happen to be upon public property, and nuisances upon private property, disturbing public rights, is unphilosophical, to say the least, and would seem not to have been regarded. In Eden, *c.* 11, it is said,—"The jurisdiction in these cases might have been supported on the ground of public nuisance, even though the act complained of had not at

the same time been a purpresture, the interposition in cases merely of public nuisance being by no means a modern branch of equitable jurisdiction. There is a precedent for this in the reign of Queen Elizabeth, which appears to have escaped observation. An information was filed by the attorney-general in the exchequer to restrain a pigeon-house: the whole court being of opinion that a pigeon-house was a common nuisance, an injunction was granted without trial at law. In *Attorney-General* v. *Forbes*, Lord *Cottenham* said "the court of exchequer, as well as this court, acting as a court of equity, has a well established jurisdiction, upon a proceeding by way of information, to prevent nuisances to public harbors . . . . and, in short, generally to prevent public nuisances." At all events, *Bond's Case* in Elizabeth's time, and *Mayor* v. *Bolt*, 5 Ves. 129, were not for nuisances in the nature of purprestures. The former was directed against a pigeon-house; and the latter against old buildings in the city of London. Yet in each case the court promptly issued the injunction without trial, suggesting no question of jurisdiction. In *Crowder* v. *Tinkler*, *Attorney-General* v. *Cleaver*, and *Attorney-General* v. *Nichol*, 19, 18, and 16 Ves., the nuisances were all strictly public; and though injunction was in each case denied, or dissolved, in the exercise of sound discretion, the inherent right of the court to interfere, and this, too, without trial at law, was distinctly recognized. It is true, that up to 1792 precedents are not numerous where the court interfered without trial to enjoin public nuisances, strictly so called; on the contrary, in almost every case the court required a trial at law. But this is no more than was true regarding applications for injunction in other cases, where the power of the court to determine for itself is undoubted. It was simply one of those cases referred to in *Le Guen* v. *Gouverneur*, before cited, and decided in the first year of this century, where it was said,—" It is true, that in some specific cases it is the common course of chancery to direct an issue at law, but even in those cases it depends on the practice of the court merely." In *Goodyear* v. *Day*, 2 Wall. Jr. 283 (affirmed in *Root* v. *R'y Co.*, 105 U. S. 189, 205, 206), the court said,—" Even in the cases where the court declines to enjoin without trial at law, the rule is not absolute. It is a practice founded more on conscience than necessity. It always rests in the sound discretion of the court." In Eden, *c.* 11, after asserting and proving the jurisdiction, the commentator says,—" But notwithstanding the jurisdiction, the courts of equity are extremely unwilling to interpose, in cases of public nuisance, without a trial at law; therefore a question has always arisen in these cases, whether the court will grant, or continue an injunction, to the trial." In *Burnham* v. *Kempton*, 44 N. H. 95, the court said,—" Ordinarily courts of equity will not take upon themselves to decide the fact that a nuisance exists, but will require that the party first establish his right at law." So in *Wason* v. *Sanborn*, 45 N. H. 171, and

*Bassett* v. *Manf. Co.*, 47 N. H. 437, unwillingness and discretion, rather than any lack of jurisdiction, are declared to be the ground for requiring trial at law. This unwillingness explains why precedents of trial by the court were so rare prior to 1792, and precludes any inference of want of jurisdiction.

One fact I desire particularly to emphasize: all the early English cases of common nuisance, where the court refused to interfere without trial, involved the inquiry, whether, under all the circumstances, the place or thing was a nuisance or not. Invariably it was something legitimate in itself, almost always some praiseworthy industry, and a nuisance, if at all, only as the fact might be found from a variety of considerations. But suppose in every instance the place or thing had been a nuisance in fact, declared such by law, so that the only question for trial had been, simply, whether or not the place or thing existed: would the court, even as matter of practice, have required a jury trial in any case? We are not without authority upon this point. From the earliest times a distinction has been made in behalf of nuisances *per se.* In such cases the court has always been free to interpose without trial. The distinction is well stated in Eden, *c.* 11, as follows: " Where the matter complained of is not *ipso facto* a nuisance, but may be so according to circumstances, the court will require those circumstances to be ascertained by a verdict; but where it is in itself a nuisance, the court (if there is sufficient evidence of its existence) will restrain it without verdict." The text just quoted is based upon the authority of Lord *Hale* and the case of *Yard* v. *Ford*, 2 Saund. 172. Lord *Hardwick*, in *Attorney-General* v. *Doughty*, 2 Ves. Sen. 453, speaks of a plain case of nuisance as contradistinguished from others, and as entitling the court to grant an injunction without trial. We find the distinction more elaborately discussed and fully sustained in the leading case of *Ripon* v. *Hobart*, 3 Myl. & K. 169, where the conclusion is stated thus: "If the thing sought to be prohibited is in itself a nuisance, the court will interfere without waiting for the result of a trial. But where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may, according to circumstances, prove so, the court will refuse to interfere until the matter has been tried at law." In *Kirkman* v. *Handy*, 11 Humph. 406, the authorities are reviewed, and the same distinction declared. *Mohawk Bridge Co.* v. *R. R. Co.*, 6 Paige 554, is a strong case, and is quoted approvingly and at length in High on Injunctions, *p.* 271. In *Burnham* v. *Kempton* 44 N. H. 97, the court said,— "If the thing sought to be prohibited is clearly a nuisance, and the complainant's right is not doubtful, the court will grant an injunction without waiting the result of a trial. But where the thing sought to be restrained is not in itself a nuisance, but only something which may, according to circumstances, prove to be such, the court will not interfere until the matter has been tried at law."

The distinction is sound. We can conceive why a court would hesitate to condemn an otherwise legitimate industry as a common nuisance. The great variety of practical considerations involved in such a judgment call very reasonably for a jury trial; but where all these perplexing matters are conclusively determined in advance, and there is nothing to do but to find whether the object complained of exists as a mere physical fact, an entirely different aspect is presented. For instance, it is one thing to determine whether the dam complained of in the Olcott Falls case,[1] now pending in this court, is a reasonable use of the Connecticut river, such as every man has a right to make of it, or whether it is so far an abuse of that right as to become a common nuisance, and quite another thing to determine the simple physical fact whether the dam exists. As to nuisances *per se*, the power of granting injunctions was, at the time of the formation of our constitution, long before, and ever since has been, absolute, and not subject to right of jury trial. The nuisances within the provisions of the act under consideration are all nuisances *per se*. They have been so declared in other jurisdictions, under similar statutes. In *Train* v. *Disinfecting Co.*, 144 Mass. 523, the court said,—" Where anything is declared a nuisance by the legislature, it is not competent for the party to show that it is not in fact one." In *Mugler* v. *Kansas, supra*, the court said,—" Here the fact to be ascertained is, not whether a place kept and maintained for purposes forbidden by statute was *per se* a nuisance, that fact being conclusively determined by the legislature itself." In *Carleton* v. *Rugg*, the court said,—" That which is declared by a valid statute to be a nuisance, is deemed in law to be a nuisance in fact, and should be dealt with as such."

It is said, that if jurisdiction existed at all to enjoin public nuisances without trial, it was only to do so temporarily. This proposition is based upon the absence of precedents of perpetual injunctions against nuisances before 1792. But nuisances are not exceptional in this regard. It was the almost universal practice, in all sorts of cases, not to decree perpetual injunctions without trial, where there was any controversy of fact. But it was only a practice of the court, and not an arbitrary limitation upon its jurisdiction. Mr. Kerr, *p.* 217, says,—" Parties seeking equitable relief could not formerly have their cases wholly disposed of by the court. The practice of the court upon an application for an injunction was either to grant temporary injunction, putting the plaintiff to establish his right at law within a given time, or to retain the bill with liberty to bring an action. The legislature, for the purpose of diminishing the mischief arising from this division of an investigation, which should be one and entire, made it obligatory on the court of chancery, by 25 and 26 Vic., *c.* 42, to decide all questions of law or fact on the determination of which

[1] *Connecticut River Lumber Co.* v. *Olcott Falls Co.*, 65 N. H. 290.

the title to relief or remedy in equity depends." Thus it is
plainly declared that the denial of final relief until after trial was
a mischievous and reprehensible practice, which the legislature felt
called upon to break up by positive enactment.    Pomeroy, *vol.*
1, *s.* 252, of his work on Equity Jurisprudence, says,—" The rule
requiring trial before final injunction was one of expediency and
policy, rather than any essential condition and basis of the equitable
jurisdiction."    And elsewhere, *s.* 1337, the same commentator
says,—" While injunctions may be final, or preliminary to other final
relief, they all depend upon the same general principles, doctrines,
and rules, regarding the jurisdiction to grant them."    Had the
practice rested upon any arbitrary foundation, there would have
been no exception to the rule, while in fact there were many
instances of final injunction without trial.    Thus, in *Bond's Case,*
Moore 238, the injunction was perpetual without trial; and so,
says Mr. Eden,—" In the cases cited from Lord *Hale,* and in the
modern decisions in the exchequer, which, although purprestures,
were also nuisances, final decrees were made without any trial."
In the case of *Brackett* v. *Parsons,* before Sir *Joseph Jekyll,* at the
rolls, July 8th, 1718, and upon appeal before Lord Chancellor
*Parker,* and upon appeal again in the house of lords, a perpet-
ual injunction was decreed and twice affirmed.    In *Oxford* v.
*Richardson,* 6 Ves. 706, Lord *Eldon* said, citing *Brackett* v. *Par-
sons,* " to prevent mischief the party has a right to an injunction,
not only to the hearing, but a perpetual injunction, if the circum-
stances warrant it."    In *Inchbald* v. *Barrington,* L. R. 4 Ch.
Ap. 388, the court said,—" If the evidence is satisfactory, the
court will grant an injunction against a nuisance without having
the question whether there is a nuisance tried by a jury."    The
text-books recognize no arbitrary rule on the subject.    In Kerr, *p.*
218, it is said,—" In a clear case the court may determine questions
of fact without taking the opinion of a jury upon the point,
although required by the defendant to do so."    Elsewhere, *ss.*
340 and 209, the same author says,—" If the right at law is clear, or
fairly made out, and the fact of its violation is also clear, or fairly
made out, it is the duty of the court to protect the property by
injunction until the hearing.    In a strong case, the court may, in
the exercise of its discretion, determine the question at once, with-
out putting the parties to any further expense."    In a note on page
225 of the same work, it is said,—" The court will not, in general,
grant a perpetual injunction until the right and violation of the
right have been established on trial; but if a case is presented
which satisfies the mind of the judge that such a course would, if
adopted, do justice between the parties, the court will grant a per-
petual injunction without providing for a trial of the right."
In Wood on Nuisances, *p.* 785, it is said,—" It is not necessary that
the right should first be established at law, as, if the right is clear,
and its violation established, an injunction will be granted if the

nature of the injury is such as would warrant an injunction after verdict."

If it is true, that prior to 1792 there was an absolute right to jury trial in nuisance cases before final injunction, that right is guaranteed by the constitution of almost every state in the Union. Yet we know that perpetual injunctions against common nuisances have been granted all over this country without such trial, although strenuously insisted upon. Sto. Eq. Jur. 927 *e.*; *Penn.* v. *Bridge Co.*, 13 How. 518; *Minke* v. *Hopeman*, 87 Ill. 450; *Attorney-General* v. *Hunter*, 1 Dev. Eq. 12; *Wahle* v. *Reinbach*, 76 Ill. 323; *Wolcott* v. *Melick*, 11 N. J. Eq. 204. Precedents of this character, so common in the United States, prove that it has not been the understanding that there was in 1792 an absolute right of jury trial before perpetual injunction against common nuisances. But, however it may have been in other cases, it is certain that, as to nuisances *per se*, the court was from the earliest times at liberty to grant, and was in the habit of granting, both preliminary and final injunctions without trial. Regarding the common law as the test, there is no constitutional right of trial by jury in New Hampshire in equitable proceedings for the restraint of common nuisances, particularly nuisances *per se*, such as those within the contemplation of this act, or in fact in any other equitable proceedings for an equitable remedy known and established in England in 1792.

As to the phraseology of our constitution, I have endeavored to show that, while verbally different from that in some jurisdictions, it is the same in meaning and effect. To this point we have cited Cooley, Proffatt, and many well considered cases. But the conclusive answer to all argument based upon the peculiar language of article 20 is found in the decisions of the Maine and Massachusetts courts under constitutional provisions identical with our own. In the late case of *Call* v. *Perkins*, 65 Me. 439, the court said,—" Prior to statute of 1873, *c.* 130, jury trial in equity was a matter wholly within the discretion of the court. That statute made it imperative on motion of either party." In *Ward* v. *Hill*, 4 Gray 595, the court said,—"It is well established as a rule of chancery, that, on hearing, a jury trial will be ordered, or not, according to the sound judicial discretion of the court. This case has been repeatedly followed in Massachusetts, and, in spite of some seeming contradictions and doubtful expressions in recent cases, the principle it states must be considered settled there. Once or twice some judge has inadvertently spoken of the trial as matter of right, but the court has always been quick to repudiate it. *Shaw* v. *Railroad*, 16 Gray 409; *Iron Co.* v. *Iron Co.*, 102 Mass. 45. The recent case of *Powers* v. *Raymond*, 137 Mass. 483, has been thought to establish jury trial, as matter of right, in equity. But an examination of the case will disclose that the proceeding there was for a purpose unknown to equity juris-

diction before the constitution.   It was to recover a debt which the defendant generally denied.   It was brought in equity by virtue of a statute of 1875, *c.* 235, and in order to reach property which the plaintiff alleged had been conveyed by the defendant in fraud of creditors.   The court held, that upon the general issue of *non-assumpsit* there was a constitutional right to trial by jury. But it was upon the distinct ground that the subject of the bill was one over which there was no equity jurisdiction before the constitution, or ever, apart from the statute.   This was merely following the general principle (Proffatt, *s.* 93) that "the jurisdiction of equity cannot, under color of statutory amendments or proceedings, be extended by the legislature so as to embrace matters which before the adoption of a constitution were common-law rights, so as to cut off the right of trial by jury."   When our legislature undertakes to say that one man may sue another upon a promissory note, by bill in equity, and demand the judgment of the court thereon, without trial by jury, I shall not be found contending for the constitutionality of the law.   The nuisance act undertakes no such innovation.   As we have shown, it is merely declaratory of an ancient equity jurisdiction, existing at the time the constitution was adopted, and supported by precedents as far back as the reign of Queen Elizabeth.

In regard to the peculiar law of New Hampshire before 1792, we submit that equity, as a great branch of the common law, in its broadest sense, together with all the peculiar attributes of jurisdiction belonging to it in the land from whence they came, was brought to New Hampshire by the first settlers, and continued a part of its jurisprudence until the adoption of our constitution.   This is proven by the grants and charters and royal commissions,—constitutions, so to speak, of New Hampshire, from its first settlement until the Revolution.   The first piece of evidence bearing upon the subject, in fact the first parchment in the settlement and organization of New England, is the charter granted November 3, 1620, by James I, to the council established at Plymouth in the county of Devon, for planting, ruling, ordering, and governing New England; which provided, among other things, that "all statutes, ordinances, and proceedings, in cases both criminal and civil, shall be agreeable to the laws, statutes, government, and policy of the realm of England, as near as conveniently may be."   *State* v. *Rollins,* 8 N. H. 560; *Perkins* v. *Scott,* 57 N. H. 79.   This was the original charter, out of which sprang the several governments in New England.   In thus providing for the government of one of her own provinces, by her own subjects, according to the "laws, statutes, government, and policy of the realm of England," could the mother country have intended to omit equity jurisprudence, which, long before this, had, according to Story, *s.* 51, developed into "a broad and boundless jurisdiction," and which, almost at this very

time, was emerging from a contest with courts of law whereby its jurisdiction was firmly established and vastly extended? This seems very improbable. The better and only reasonable interpretation is, that she intended her provinces should enjoy the blessings of her own jurisprudence, so far as it was adapted to their necessities. The same guaranty of a government according to the English system of laws is preserved in all the subsequent grants, charters, and commissions. November 7, 1629, the council of Plymouth granted New Hampshire to Capt. John Mason, exacting from him an express covenant that he should "establish in the territory granted, and continue the same from time to time, such government as should be agreeable to the laws and customs of the realm of England." *State* v. *Rollins.* April 22, 1635, a supplementary grant by and to the same parties, of the same territory, was made, "with power of judicature in all causes and matters whatsoever, criminal, capital, and civil, to be exercised and executed according to the laws of England." *State* v. *Rollins.*

Soon after this, New Hampshire came under the jurisdiction of Massachusetts by mutual agreement, and so continued for about forty years, from April 14, 1642, to July, 1679. This union, not authorized by the English privy council, was dissolved: the further operation of Massachusetts laws over New Hampshire was forever prohibited. A commission passed the great seal on the 18th of September, 1679, constituting New Hampshire a distinct province, and providing for a president and council, which should be "a settled court of record for the administration of justice in all cases, so always that the form of proceedings in such cases, and the judgments thereon, be consonant and agreeable to the laws and statutes of this our realm of England." This commission is known as the Cutt commission, because it runs to John Cutt, creating him the first president of the province. As was said by Governor Wentworth in his last message,—"It laid the foundation of the constitution by which the Province has since been governed. The laws of the Province rest upon this foundation." Here, again, in a fundamental document having the dignity and weight of a constitution, the laws of England, so far as suited, were made the rule of government for New Hampshire, without exception or qualification, including, therefore, that great branch of English jurisprudence known as equity. "It would seem," says *Ladd,* J., in *Copp* v. *Henniker,* citing numerous authorities, "that the Cutt commission conferred equity jurisdiction upon the governor and council." Pursuant to this commission, an assembly was convened for the enactment of laws, and the first act of this first legislative body provided that "the laws they had formerly been governed by should be a rule in judicial proceedings, so far as not repugnant to the laws of England." *State* v. *Rollins;* 1 N. H. Prov. Pap. 313. Cutt died April 5, 1681; and May 9, 1682, Edward Cranfield was commissioned. By this commission Cran-

field and his council were authorized and empowered, among other things, to "erect, constitute and establish such and so many courts of judicature and public justice within said province and plantation within your government, as you and they shall think fit and necessary for the hearing and determining of all causes, as well criminal as civil, according to law and equity." 1 N. H. Prov. Pap. 9, 14, 25, 376, 437; *Perkins* v. *Scott*, 57 N. H. 80. Here, then, we have a distinct and express recognition (1682) of the existence of equity as a part of the jurisprudence of the province. But, what is more conclusive still, about this time Robert Mason was appointed chancellor, and acted as such. Mr. Shirley was obliged to concede (*Perkins* v. *Scott*, p. 68) that "he acted as chancellor in three cases." One case will be found stated in Belknap, pages 102, 103, as follows: "Martyn petitioned Mason as chancellor, setting forth that he had received and disposed of the money according to orders of the late president and council, and prayed that the whole burden might not lie on him. A decree was then made that the other surviving members of the late council, and the heirs of those who were dead, bear their proportion." Judge *Bell*, in *Wells* v. *Pierce*, 27 N. H. 512, said,— "Under the first royal governor of this province, Robert Mason was appointed chancellor of the province, and among the early records are to be found bills in equity, which were heard and decided before him."

A few years later (1692) the provincial assembly, in an act entitled "An act for establishing courts of judicature," provided as follows: "That there shall be a court of chancery within this province, which said court shall have power to hear and determine all matters of equity, and shall be esteemed and accounted the high court of chancery of this province; that the governor and council be the said high court of chancery," etc. It is clear that trial by jury was not to be had in any case before this court. *Copp* v. *Henniker*, 55 N. H. 185. It is established that in 1692 equity was a part of the jurisprudence of the province; that it had a distinct equity court; that there had been numerous cases of that nature; and that jury trial was no part of the system. That court, with its equitable jurisdiction, continued on down to the Revolution; the court itself, which had become offensive by its arbitrariness, was then abolished, but the branch of jurisprudence which it was specially constituted to administer, though lost sight of, perhaps, in the vicissitudes of the Revolution, flowed on, and is to-day a part of the jurisprudence of New Hampshire as much as if no statute had ever been passed concerning it. It was contended by Mr. Shirley, in *Perkins* v. *Scott*, that the court of chancery ceased to exist in 1699, and that the jurisdiction was never revived until by statute in the early part of this century. No act of the provincial assembly, of provincial authority of any kind, or of the mother country, is cited in support of the proposition. It is based wholly

upon the assumed fact, that at about the same time a similar court and jurisdiction dropped out of use in Massachusetts, and upon the further fact, that investigation had failed to disclose any record of equity proceedings subsequent to that period. As was said by Mr. Sullivan, in his brief in *State v. Rollins*, 8 N. H. 557,—" The decisions of our courts at that period were few, . . . . and the facts and circumstances connected with those decisions were not preserved in published reports, but depended upon memory alone, and were soon forgotten." Mr. Shirley conceded ( *p.* 60) that there was a court from 1699 to 1774, whose records were indifferently termed "the records of the court of appeals and of the court of chancery." Why were the records thus entitled if the court of chancery had ceased to exist in 1699? If the court had passed away, why, in 1727 and 1728, was the house of representatives protesting against a court "sometimes called a court of appeals and sometimes the court of chancery"? Judge *Bell* (27 N. H. 512) said,—" There is nothing to show that the court was ever abolished, and it is supposed that it continued to exercise chancery powers until the Revolution." Judge *Ladd*, in *Copp* v. *Henniker*, 55 N. H. 210, said " the judiciary act of 1692 [creating the court of chancery] not being repealed, there seems to be no reason to suppose that the jurisdiction ceased before the Revolution."

The court was abolished June 28, 1776. And it is claimed that from that time, at least until 1792, the time of the adoption of the constitution, there was no equity jurisdiction in New Hampshire. There was no prejudice against the principles of equity. On the contrary, as shown by Mr. Shirley ( *p.* 69), all the while the people were shunning the chancery court, the administration of equity principles was going on, by usurpation, of course (but not for that reason less significant), in the general assembly. There is no reason to suppose, from the simple abolishment of the court, that a great branch of jurisprudence, indispensable to the due administration of the common law, and towards which the people had indicated every mark of favor, was wiped out of existence. The contrary conclusion is supported by one of the first acts of the provisional government, enacted in 1776, which provided "for reëstablishing the general system of laws heretofore in force in this state [at the time the present government was assumed], and that they be revived, reënacted, and directed, and ordered to abide and remain in full force." As we have shown, equity was an important part of that "general system of laws" previously existing in the province, and was, hence, continued and reënacted. An offensive court was abolished, but the great body of the law brought here by the first settlers, including, of course, the principles of equity, flowed on. Judge *Parker*, in *State* v. *Rollins*, 8 N. H. 562, held that the common law in its widest sense, and whether it had been previously practised upon in the province or not, was continued in force by that act of the provisional assembly.

The common law, in its widest sense, includes the doctrines of equity. This has been frequently declared. Bouv. Law Dict., tit. Com. Law; *Williams* v. *Williams*, 8 N. Y. 541; Sto. Eq. Jur. 57; Pref. to 1 Johns. Ch.; *Parsons* v. *Bedford*, 3 Pet. 445. Furthermore, it is distinctly held, in *Wells* v. *Pierce*, 513, and in *Copp* v. *Henniker*, 210, 211, that " the principles of equity were practised upon after the Revolution, and before the creation of any distinct equity jurisdiction by the courts of law." Such, then, was the situation when the constitution was framed. For more than one hundred and fifty years equity had been a branch of provincial jurisprudence; for more than eighty years preceding the Revolution there had been a distinct court of chancery; and after the Revolution the principles of equity were continued and acted upon by the courts of law. Then came the constitution, which continued in force the same laws that had been reëstablished and reënacted by the act of the provisional legislature in 1776, including the principles of equity. *State* v. *Rollins*, *supra*. This conclusion is more directly sustained by Judge *Bell* in *Wells* v. *Pierce*, where he says,—" Equity, as a great branch of the law of the mother country, was brought over by the colonists, and has always existed as part of the common law in its broadest sense."

Under such circumstances, viz., the existence of equity as part of the jurisprudence of the province from its first settlement until the Revolution, and its preservation and continuance by the provisional government and the constitution, we submit that when the fathers, in 1792, guaranteed the right of trial by jury, except where it had not previously existed, they must have had in contemplation, as coming within the exception, cases in equity in which there never had been trial by jury as matter of right, either in England or in the province, and which everywhere constituted the most conspicuous exception to that mode of practice.

The fact that equity principles may have lain dormant in the hands of an unpopular court, and therefore had only a theoretical existence, does not alter or affect the conclusion. By excepting cases where it was before otherwise used and practised, was not intended actual practice. For instance, counsel concede (65 N. H. 290) that probate cases were excepted from the general guaranty: but do they mean simply such peculiar probate cases as may have been actually practised? or do they mean all cases of probate nature, whether practised or not, thus including cases which had only a theoretical existence? So of cases in equity: does it follow, because, as a result of the unpopularity of the court administering equity principles, there were no such cases, that none could have been contemplated by the exception, or, if there were only two or three, that the exception referred to those and to no others? As well say, because the constitution continued in force those laws " usually practised on " before its adoption, that only such laws were continued as were actually practised upon,

and no others. This was contended in *State* v. *Rollins*, but Judge *Parker* held that the phrase "usually practised on" was not limited to laws actually practised, but included the great body of laws brought over and continued by the charters, grants, and commissions, whether acted upon or not. It follows that the exception in article 20 of the Bill of Rights, of cases heretofore otherwise used and practised, includes all cases which might have been tried without a jury under the jurisprudence of the province. If article 20 is to be interpreted on the basis that equity formed no part of our jurisprudence when the constitution was adopted, we must resort to the mother country for the true application of of the term "heretofore used and practised." *Perkins* v. *Scott*, 57 N. H. 82; *Jones* v. *Corporation*, 4 Pick. 507; *Pomeroy* v. *Winship*, 12 Mass. 525.

In *Marston* v. *Brackett*, 9 N. H. 349, and *Hoitt* v. *Burleigh*, 18 N. H. 389, 390, where trial by jury, in equity, of all controverted questions of fact is held to be a constitutional right, this point was not thoroughly considered. No authority is cited, and no general reasons are assigned. Declaring, as they did, a doctrine nowhere else recognized, it is not remarkable that they were soon doubted. The principle they declared was questioned by counsel, and considered as not settled by the court, in *Clark* v. *Society*, 45 N. H. 334. In *Copp* v. *Henniker*, Judge *Ladd* said,—"If Judge *Parker* had understood this branch of our provincial history as Chief-Justice *Bell* understood it, it would seem that it would not have been held (as it was, without consideration, in 1838) that the constitution guarantees the right of jury trial in cases within the jurisdiction of chancery. This doctrine seems to be recognized nowhere but in New Hampshire. 2 Allen 519; 102 Mass. 45. Pomeroy says the New Hampshire rule 'is purely exceptional, and must depend upon an early practice in that state peculiar to itself.' Sedg. St. and Const. Law 489, *n*., 2d ed. If the court, in 1838, had been aware of the provincial practice, this peculiarity might not have existed; for the circumstance that in 1792 there was no chancery court, and had been none since 1776, might not show conclusively that, for the purposes of this question, Chief-Justice *Bell* was in error in saying that equity has always constituted a part of the law of New Hampshire. The fact that, in the absence of a court of chancery, courts of law acted to a considerable extent . . . . upon the principles of equity, seems to substantiate Judge *Bell's* position." In *Perkins* v. *Scott*, *Ladd*, J., said,—"It probably will not be denied, that, until the case of *Marston* v. *Brackett*, decided in 1838, it had not been intimated in this state, or anywhere else, that there was a right of trial by jury in equity proceedings. I venture to say that if such a right ever existed in this state, it was after and not before the observation of Chief-Justice *Parker* in that case. It is not necessary, in the view I take, to inquire whether that observation established such a singu-

lar and anomalous doctrine in this state or not.   It is enough that
up to that time all the books and cases, wherever the common law
prevails, are the other way."   " In proceedings in equity the par-
ties have no constitutional right of trial by jury."   *Bellows* v. *Bel-
lows*, 58 N. H. 60.   " There is not, and never has been, an abso-
lute constitutional right of trial by jury in equity cases."   *Davis*
v. *Dyer*, 62 N. H. 236.

It is said, that though it may be true that there is no constitutional
right to jury trial in equity cases generally, either by the English
or the provincial test, yet, in respect to the particular branch of
equity jurisdiction which relates to nuisances, there is a constitu-
tional right to jury trial, because throughout the early history of
New Hampshire and down to 1792 there was a statute providing
for the abatement of nuisances by one of the courts of common law,
which expressly secured the right of trial by jury.   In *Kim-
ball* v. *Connor*, 3 Kan. 414, the court said,—" The provision that
trial by jury shall remain inviolate does not contemplate that every
issue which by statutes in force at the adoption of the constitution
was triable by jury should remain irrevocably triable by that tri-
bunal.   Trial by jury is guaranteed only in those cases where that
right existed at common law."   In *Anderson* v. *Caldwell*, 91 Ind.
451, the court said,—" The right which the constitution declares
shall remain inviolate, is the right of trial by jury as it existed
when that instrument was adopted.   The right so carefully guarded
and preserved, is the one transmitted to us by our British ances-
tors.   In determining, therefore, in what cases the constitution
guarantees the right of trial by jury, we are to look at the com-
mon law, and not to particular statutes which may be changed at
the pleasure of the legislature."   There is nothing in the stat-
ute which takes away the ancient jurisdiction of the court of
equity to enjoin without such trial.   It is a settled principle, that
a statute, to have such effect, must expressly take away the old
remedy.   Wood Nuis., *p.* 2, *n.* 1, *p.* 19, *s.* 12; *Renwick* v. *Morris*,
7 Hill 575; Dw. Stat. 678, 679; *Com.* v. *Ruggles*, 10 Mass.
391; *Wells* v. *Pierce*, 27 N. H. 512, 513; *State* v. *Wilson*, 43
N. H. 420; *Varet* v. *N. Y. Ins. Co.*, 7 Paige 567.   The early
provincial statute merely provided for the present abatement of
nuisances.   It made no provision for an injunction against their
recurrence, further than a penalty fixed by the act might have
that effect.   Of course this ancient proceeding of the common law
for present abatement under a statute imposing a penalty was laid
in a common-law court, and made subject to trial by jury.   But
the right to proceed in equity for a perpetual injunction and with-
out trial by jury continued as it has always continued in Eng-
land, hand in hand with the common-law remedy.

ALLEN, J.   " Equity, as a great branch of the law of their
native country, was brought over by the colonists, and has always

existed as a part of the common law in its broadest sense in New Hampshire." *Wells* v. *Pierce*, 27 N. H. 503, 512; *Copp* v. *Henniker*, 55 N. H. 179, 210; *Penhallow* v. *Kimball*, 61 N. H. 596, 598, 599; *Carroll* v. *McCullough*, 63 N. H. 95, 98; *Eckstein* v. *Downing*, 64 N. H. 248, 259. "Until the case of *Marston* v. *Brackett*, 9 N. H. 336, decided in 1838, it had not been intimated in this state, or anywhere else, that there was a right of trial by jury in equity proceedings. I venture to say that if such a right ever existed in this state, it was after and not before the observation of Chief-Justice *Parker* in that case. It is not necessary, in the view I take, to inquire whether that observation established such a singular and anomalous doctrine in this state or not. It is enough that up to that time all the books and cases where the common law prevails are the other way." *Ladd*, J., in *Perkins* v. *Scott*, 57 N. H. 55, 81. The novel doctrine, adopted "without consideration," was abandoned as soon as it was examined. *Copp* v. *Henniker*, 55 N. H. 179, 210, 211; *Bellows* v. *Bellows*, 58 N. H. 60; *Sargent* v. *Putnam*, 58 N. H. 182; *Proctor* v. *Green*, 59 N. H. 350, 352; *Davis* v. *Dyer*, 62 N. H. 231, 236.

"In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised . . . . the parties have a right to a trial by jury." Bill of Rights, *art.* 20. If this clause had been reënacted in 1792, 1851, 1877, and 1889 (when constitutional amendments were submitted to the people), it is not to be assumed that its original meaning would have been changed. But it has not been enacted since it took effect, in 1784. The impression that a constitution was adopted in 1792 (Gen. Laws 40, *n.*; 55 N. H. 190–192) is erroneous. Journal of the Convention in 10 Prov. and St. Pap. 57, 63, 110–114, 141–168; Constitution, *art.* 97 (formerly *art.* 98). The error may have arisen from a misunderstanding of votes passed by the convention (Journal, *p.* 167), the certificate signed by the president and secretary of the convention (Gen. St., *p.* 34), and the act of December 14, 1792. Laws, ed. of 1797, *p.* 50. The state has had but one permanent constitution. (The government of 1776 was intended to be temporary. 10 N. H. 143; 59 N. H. 272.) "The constitution of 1792" is a misnomer. In article 20 of the Bill of Rights, and in article 89 of the second part of the constitution, "heretofore" means before 1784.

"All the laws which have heretofore been adopted, used, and approved in the province, colony, or state of New Hampshire, and usually practised on in the courts of law, shall remain and be in full force until altered and repealed by the legislature, such parts thereof only excepted as are repugnant to the rights and liberties contained in this constitution." Article 89. "All the laws which have heretofore been . . . . usually practised on in the courts" can be read in a sense that includes only such legal rules

as can be shown to have been applied in New Hampshire cases. But this is not the meaning. The English common law, modified by American conditions, is one of " the laws which have heretofore been adopted, used, and approved in the province . . . . of New Hampshire and usually practised on in the courts." This body of New Hampshire law (being the common law of England, such parts excepted as are not consistent with the constitution, or not applicable to the institutions or circumstances of the country) is to " remain and be in full force until altered and repealed by the legislature." *State* v. *Rollins*, 8 N. H. 550, 563, 564; *Lord* v. *State*, 16 N. H. 325, 330; *Concord M. Co.* v. *Robertson*, 66 N. H. 1, 7.

In 1836, when the defendant in *State* v. *Buckman*, 8 N. H. 203, was found guilty of the common-law offence of maliciously tainting and corrupting a well of water by putting the carcass of an animal in it, the state was not required to show an actual or usual practice in the New Hampshire courts in this branch of criminal law before 1784. The defendant's motion in arrest of judgment would not have prevailed if the state had admitted that this was the first American case in which the rights of person and property had been violated in the manner set forth in the indictment. These rights were brought to this state by the first settlers, and were founded on legal principles, and not on the mere evidence of law furnished by judicial decisions. These principles would have remained in force if article 89 had not been adopted. A written order was as unnecessary for the continuance of the unwritten law in 1784 as for its introduction in 1623.

" The common law of England consisted of those maxims of freedom, order, enterprise, and thrift which had prevailed . . . . from time immemorial. It was the outgrowth of the habits of thought and action of the people, and was modified gradually and insensibly from time to time as those habits became modified. . . . . Springing from the very nature of the people themselves and developed in their own experience, it was obviously the body of laws best adapted to their needs, and as they took with them their nature, so also they would take with them these laws whenever they should transfer their domicile from one country to another. . . . . From the first, the colonists in America claimed the benefit and protection of the common law. In some particulars, however, the common law as then existing in England was not suited to their condition and circumstances in the new country, and those particulars they omitted as it was put in practice by them." Cool. Con. Lim. 32, 34.

" The first colonists of New England were fishermen and farmers, their leaders were clergymen, and though they brought with them a general idea of English law and English liberty, the registers of writs were sealed books to them as much as they are to us at this day. Instead of attempting to follow the forms of the

register, they devised processes of their own. The recital of some of them will show that no reverence for any ancient forms existed among the courts here. . · . . We regard the ignorance of the first colonists of the technicalities of the common law as one of the most fortunate things in the history of the law; since, while the substance of the common law was preserved, we happily lost a great mass of antiquated and useless rubbish, and gained in its stead a course of practice of admirable simplicity, and one which seems to us far better than the most improved codes of practice which have been recently introduced elsewhere." *B. C. & M. R. R.* v. *State*, 32 N. H. 215, 230, 231.

With substantive rights, the first settlers brought over the incidental rights of adequate remedy and convenient procedure. Cases cited in 64 N. H. 178, 179. If the jurisdiction of a court of equity were an arbitrary power of violating legal rights, or doing justice in cases in which there is no law, it might be said that equity was not a part of the common law brought over by the colonists, and that it did not exist here before a provincial court of chancery was established. But the work of such a court being the administration of law and the maintenance of rights (chiefly in cases in which the power of other courts was formerly supposed to be defective in respect to adequacy of remedy and procedure—3 Bl. Com. 429–442), the theory that equity was not a branch of the provincial law cannot be accepted without overturning the fundamental principle that adequate remedies are incidents of substantive rights, and holding that from the necessity of sufficient means of protection the law implies a remedial system that is insufficient. Adequate remedy includes not only real actions, writs of possession, replevin, judgments for damages, and other process used in the courts of king's bench, exchequer, and common pleas, but also the specific performance of some contracts, and specific relief by injunction, receivership, partition, and other forms of equitable decree for trusts, fraud, accident, mistake, confusion of boundaries, partnership, nuisance, and other cases of equity jurisdiction.

For some purposes, legal rights may be conveniently divided into classes; but every classification does not indicate that they came into existence at different times. The incidental right to an adequate remedy for the infringement of a right derived from the unwritten law, is coeval with the right of which it is an incident. The law of right and remedy that was administered in *State* v. *Buckman* came with the first immigrants who landed at Portsmouth, and not with the first provincial tribunal authorized to enforce it, or the first provincial magistrate authorized to issue a warrant. Before a court was established here to administer any branch of the law, the first English inhabitants were entitled to the protection afforded by the punishment of common-law offences, the reformation of erroneous deeds, and other adequate civil remedies, compensatory and specific. The establishment of the first provin-

cial courts that had jurisdiction of criminal and equity cases was a recognition of existing rights, substantive and remedial. *Rich* v. *Flanders*, 39 N. H. 304, 328. If all rights were now left, for one year or ten years, without a judicial jurisdiction in which they could be maintained, their legal existence during the interval would not be disproved. The obstruction of navigation by a boom across the Piscataqua would have been a nuisance abatable by an injunction from the provincial court of chancery, without the process of indictment and jury trial, which would be inadequate by reason of its dilatory character. The right to an immediate remedy, as adequate as an injunction, is an incident of the right of navigation which was not created by the establishment of a court. If there had been no court of chancery here during the provincial period, it would nevertheless be true that adequate remedies are incidents of legal rights, and that the specific forms of equitable relief, so far as justice requires them, are required by a settled rule of the ancient unwritten law as interpreted and administered in this state. By this law, the defendant in *State* v. *Buckman* had a right of jury trial which he would not have had in a suit in equity.

The bill of rights was not the beginning of law for the state. The general phraseology of articles 20 and 89 assumed the existence of a well understood system which was to remain in force. The jury trial given in "the court maritime" by the act of July 3, 1776, was a peculiarity which the last clause of article 20 authorized the legislature to abolish. Such a clause, apparently inserted out of abundant caution, does not establish the construction that article 20 perpetuates every statutory method which the legislature were not specially authorized to alter. The right of jury trial was not introduced or enlarged in 1784. "The constitutional provisions do not extend the right; they only secure it in the cases in which it was a matter of right before." Cool. Con. Lim. 504, 75. In this elementary doctrine the authorities concur. The provision of the federal constitution, that in the federal jurisdiction "the trial of all crimes, except in cases of impeachment, shall be by jury," "is to be interpreted in the light of the principles which at common law determined whether the accused, in a given class of cases, was entitled to be tried by a jury." *Callan* v. *Wilson*, 127 U. S. 540, 549. For the purpose of the present inquiry, jury trial in all cases except those "in which it has been heretofore otherwise used and practised," is jury trial " in all cases in which it has been heretofore used." Whichever expression is used, the meaning is, that the unwritten jury law, brought to this country by the first settlers, is in force so far as it had not been altered by usage or legislation before 1784. *Petition of Mt. W. Co.*, 35 N. H. 134, 142–145; *Patrick* v. *Cowles*, 45 N. H. 553, 555; *Cocheco Co.* v. *Strafford*, 51 N. H. 455, 457–459. So far as the rights of the parties in this case are concerned, the difference between article 89 and the reservation of jury trial in the bill of rights is immaterial. The

jury law, continued in force by article 89, as a part of the existing body of laws, subject to the legislative power of alteration and repeal, is withheld from that power by the bill of rights.  As the substance of the jury-trial right of 1784 would exist to-day if no constitution had been adopted and no statute had been enacted, and as it is not claimed that the legislature have attempted to impair it, the question is, whether, by the unwritten law, there would· have been a right of jury trial in this case in May, 1784 (before the constitution took effect), if the case had then been pending in a court of equity.

.The essentials of jury trial, "and the cases in which it had been otherwise used and practised, are shown by common-law principles and by history."  *Wooster* v. *Plymouth*, 62 N. H. 193, 203.    The usage in which the historical right is to be found is not merely that of an American province and state, but also that of the race among whom this trial was an old institution when they brought it to the new world.  Conflicting precedents of different times and places are examined for common-law rules presumed to be founded on reason.  A jury trial is a proceeding in which the jury are the judges of the facts, and the court are the judges of the law.  This was the true rule of the common law ; and this is the rule adopted by the constitution, instead of the one practised on here before and after 1784.  *Pierce* v. *State*, 13 N. H. 536; *State* v. *Hodge*, 50 N. H. 510, 522, 523.  "Suppose, at some period after the adoption of the constitution, and before the act of 1832 conferring general equity powers upon the supreme court, the legislature had given to the court a single isolated branch of equity jurisdiction and power,— as, for example, that of decreeing the specific performance of contracts,—without creating it a court of chancery by name, and without providing that any of the forms of chancery proceedings should be observed, . . . what difference could it make whether the equity power to enforce the specific performance of a contract had ever been exercised by any tribunal, either in the province or the state, before or not?  If it was a power never used nor practised in the province before the constitution in any form, then to determine the true application of the terms ' heretofore used and practised,' as used in the bill of rights, we must go to the common law with respect to the new right and power thus conferred ; and doing that, we find it not to be a case in which it had been used and practised anywhere before the constitution, to have a trial by jury as matter of legal right."  *Ladd*, J., in *Perkins* v. *Scott*, 57 N. H. 55, 81, 82.

" The modes of seeking and granting relief in equity are different from those of courts of common law.  The latter proceed to the trial of contested facts by means of a jury ; . . . courts of equity try causes without a jury."  Sto. Eq. Jur., s. 31.  In the construction of statutes and constitutions, there is a natural presumption that if a discontinuance or change of the universal and

immemorial usage had been intended, the intention would have been shown by express words or necessary implication. *Basey* v. *Gallagher*, 20 Wall. 670, was an appeal from the supreme court of the territory of Montana. The organic act of the territory recognized the distinction between the jurisdictions of law and equity, and required proceedings in both to be in the same court. It was provided by statute that there should be but one form of civil action, and that issues of fact should be tried by jury, unless a jury was waived, or a reference ordered in a certain way. A bill for an injunction was brought in a territorial district court. Questions were submitted to a jury, who returned a verdict on which both parties moved for judgment. On these motions, the court heard the whole case on the pleadings, evidence, and verdict, and rendered a decree which was affirmed by the supreme court of the territory. In rendering the decree, the district court disregarded a portion of the findings of the jury, and adopted others; and this action was approved by the supreme court of the territory, and was one of the errors assigned for reversal in the federal court where the decree was affirmed.

"The consideration," says *Field*, J., delivering the opinion in that case (*p.* 680), "which the court will give to the questions raised by the pleadings, when the case is called for trial or hearing, whether it will submit them to a jury, or pass upon them without any such intervention, must depend upon the jurisdiction which is to be exercised. If the remedy sought be a legal one, a jury is essential unless waived by the stipulation of the parties; but if the remedy sought be equitable, the court is not bound to call a jury, and if it does call one, it is only for the purpose of enlightening its conscience, and not to control its judgment. The decree which it must render upon the law and the facts must proceed from its own judgment respecting them, and not from the judgment of others. Sometimes in the same action both legal and equitable relief may be sought, as, for example, where damages are claimed for a past diversion of water, and an injunction prayed against its diversion in the future. Upon the question of damages, a jury would be required; but upon the propriety of an injunction, the action of the court alone could be invoked. The formal distinctions in the pleadings and modes of procedure are abolished; but the essential distinction between law and equity is not changed. The relief which the law affords must still be administered through the intervention of a jury, unless a jury be waived; the relief which equity affords must still be applied by the court itself, and all information presented to guide its action, whether obtained through masters' reports or findings of a jury, is merely advisory. Ordinarily, where there has been an examination before a jury of a disputed fact, and a special finding made, the court will follow it. But whether it does so or not must depend upon the question whether it is satisfied with the verdict. This discretion to disregard the findings

of the jury may undoubtedly be qualified by statute; but we do not find anything in the statute of Montana, regulating proceedings in civil cases, which affects this discretion. That statute is substantially a copy of the statute of California as it existed in 1851, and it was frequently held by the supreme court of that state that the provision in that act requiring issues of fact to be tried by a jury, unless a jury was waived by the parties, did not require the court below to regard as conclusive the findings of a jury in an equity case."

"In Idaho, as in other territories, there is but one form of civil action, in which either legal or equitable remedies, or both, may be administered, through the intervention of a jury, or by the court itself, according to the nature of the relief sought, provided, however, that no party can be 'deprived of the right of trial by jury in cases cognizable at common law.' . . . The present suit was brought to enforce a mechanic's lien created by the statutes of the territory, which authorize the court in such a suit to order both a sale of the real estate that is subject to the lien, and judgment against the owner thereof for any deficiency in the proceeds of the sale, 'in like manner and with like effect as in actions for the foreclosure of mortgages.' . . . The relief provided for in those statutes, sought by the complaint and granted by the court, was purely equitable, and the proceeding was in the nature of a suit in equity. . . . The case being one of equitable jurisdiction only, the court was not bound to submit any issue of fact to the jury, and, having done so, was at liberty to disregard the verdict and findings of the jury, either by setting them or any of them aside, or by letting them stand, and allowing them more or less weight in its final hearing and decree, according to its own view of the evidence in the cause. By the settled course of decision in this court, it is not necessary that a court of equity should formally set aside the verdict or finding of a jury, before proceeding to enter a decree which does not conform to it." *I. & O. Co.* v. *Bradbury*, 132 U. S. 509, 513, 515, 516.

"It is often the primary . . . object of a suit in equity, brought by devisees and others, . . . to establish the validity of a will of real estate; and thereupon to obtain a perpetual injunction against the heir-at-law, and others, to restrain them from contesting its validity in future. . . . In every case of this sort, courts of equity will, unless the heir waives it, direct an issue of *devisavit vel non* . . . to ascertain the validity of the will. But it will not feel itself bound by a single verdict either way, if it is not entirely satisfactory; but it will direct new trials, until there is no longer any reasonable ground for doubt." Sto. Eq. Jur., s. 1447. "There is no doubt upon the right of this court to grant a new trial after a trial at bar. . . . It is admitted to be the practice of this court; where the issue is directed to inform the conscience of the chancellor; upon this principle; that it was

the habit of this court to try upon the report of the circumstances, viz., the trial, and all the objections, whether due attention had been given to all the considerations stated; whether, according to the common expression, the conscience of the court was satisfied, or not." *St. Paul's* v. *Morris*, 9 Ves. 155, 165, 166. In that case Lord *Eldon* was of opinion (*p.* 168) that, as the record stood at the original hearing, "the court had a right to refuse, but, if asked, ought to have directed, an issue." *O'Connor* v. *Cook*, 6 Ves. 665, 671, was a bill for an account of tithes. The defence was immemorial payment of 20*l.* a year in commutation. Upon the evidence, the defendant contended that an issue should be sent to a jury. Lord *Eldon* said (in 1802), "There is no doubt that, according to the constitution of this court, it may take to itself the decision of every fact put in issue upon the record. . . . It is pretty clear that courts of equity in ancient times were more in the habit of taking to themselves the decision of questions of fact than they have thought wise and discreet in later times. As to immemorial payment, if any reasonable doubt has been raised upon it in the evidence, it has been of late thought wise and discreet to send the question of fact to a jury. All the judges have demonstrated their opinion in favor of that practice where any reasonable doubt is raised upon the fact." An issue was directed, and after verdict, on a motion for a new trial, Lord *Eldon* said that when courts of equity act upon the opinion of a jury, "their own judgment ought to concur with the verdict, to this extent at least, that they are not dissatisfied with the verdict." 8 Ves. 535, 536.

No jury could be summoned to attend the English court of chancery (3 Bl. Com. 452), and there was no appeal from its decrees to a jury court. If trial by jury in equity had been a common-law right, the means of enjoying it in that jurisdiction, or on appeal, would have been provided by law. The chancellor "is equally competent to decide on disputed facts as on disputed law; and it is a matter of discretion only when he either orders or permits the parties to submit the trial of such facts to the cognizance of a jury." 3 Bl. Com. 48, *Coleridge's note*. When the chancellor's examination of written evidence left him in such doubt that he desired the advice of a jury, he could send an issue to a court that had power to summon a jury. If he made a decree in accordance with the jury's opinion, it was not because the verdict was a binding decision, but because he was satisfied, or not dissatisfied, with it. The privilege of a hearing before a jury whose advisory verdict, obtainable only by an exercise of the chancellor's discretion, depended for its effect upon its being satisfactory, or not unsatisfactory, to him, was not the common-law right reserved by the constitution. The reservation had no reference to a discretionary power exercised in *Attorney General* v. *Cleaver*, 18 Ves. 211, and other cases (Sto. Eq. Jur., s. 923) decided before and since 1784. In the cases in which the right was reserved, it was not

connected with or affected by the reasonable doubts that had induced chancellors to seek the assistance of a jury, or the great or little deference that had been paid to advisory verdicts.

In cases of reasonable necessity, organized society, as well as each individual, may defend personal and proprietary interests without judicial process based on the verdict of a jury. Cool. Con. Lim. 434, 720, 739; Tiede. Lim. Pol. Power, c. 5; Cool. Torts 45–59; *Haley* v. *Colcord*, 59 N. H. 7, 8; *Weeks* v. *Sly*, 61 N. H. 89; *State* v. *Ray*, 63 N. H. 406, 412; *Hodgeden* v. *Hubbard*, 18 Vt. 504; *Stone* v. *Lahey*, 133 Mass. 426; *Com.* v. *Donahue*, 148 Mass. 529. " By the common law, every private person may lawfully endeavor, of his own authority, and without any warrant or sanction of the magistrate, to suppress a riot by every means in his power." 5 C. & P. 260 *n.*; L. R. 6 Q. B. 15. For the better preventing the spreading of the plague, small-pox, pestilential or malignant fever, or other contagious sickness, the infection whereof may probably be communicated to others, the act of 1714 (Laws 1771, *p.* 46) empowered selectmen to take care, and make effectual provision in the best manner they could for the preservation of the inhabitants, by removing infected persons to separate houses, and providing nurses and other assistance and necessaries. If need so required, any justice of the peace was authorized to make out a warrant to the sheriff, his undersheriff or deputy, or constable or constables, requiring them, with advice and direction of the selectmen, to impress and take up convenient housing, lodging, nurses, tendance, and other necessaries for the accommodation, safety, and relief of the sick. It was also provided that if any person coming to the province by sea happened to be visited with the plague, small-pox, pestilential or malignant fever during the voyage, or to come from any place where such sickness prevailed, a justice of the peace should forthwith take care to prevent all persons from coming on shore from the ship; if any be on shore, to send them on board again; to restrain persons from going on board; and to that end to make out a warrant directed to the proper officers, who were empowered and required to execute the same. Similar action is authorized by more recent legislation. Acts of 1789, 1792, 1799, 1803, 1807 (Laws 1830, *pp.* 178, 180, 260–269); Rev. Stat., *cc.* 119–121; G. L., *cc.* 111–113.

In some cases, health officers may abate nuisances without notice. G. L., c. 111, s. 5. A vessel attempting to pass into Portsmouth in violation of quarantine regulations made by the health officers, may be stopped by the commander of any fort near the harbor. If such vessel attempts to pass after being hailed and forbidden, and after warning given by a shot fired ahead and a shot fired astern, then such vessel shall be fired upon and into until she shall bring to, and submit to the regulations. Act of 1807, in Laws 1830, *p.* 269; G. L., *c.* 113, *s.* 13. For

the introduction of pestilence, a compensation suit, reinforced by indictment, jury trial, fine and imprisonment, is not an adequate remedy. In the interior as well as on the sea-coast, the protection of health and life require measures more expeditious and effective than compensation and punishment. In many cases where public or private rights are infringed in a manner not involving life or health, immediate relief, of a specific and preventive character, such as is furnished in the equity jurisdiction, may be indispensable. The total obstruction of a main street of Manchester or Concord by the erection of a building, would be a nuisance for the abatement of which it would not be necessary to wait for a session of court. The issue of an equitable process for the immediate clearance of the street would not be barred by the circumstance that the wrongdoer might suffer as much from a temporary order as from a final decree. It has never been understood that the bill of rights abolished the necessary powers of summary protection exercised by all governments, and rendered it impossible to deprive an infected person of his liberty in quarantine, destroy property and life by forcibly stopping an infected ship, or maintain public or private rights in any case of emergency and irreparable mischief, without a previous trial by jury. The limitation of legislative power by the constitutional reservation of private rights does not destroy the efficiency of government in all cases in which public or private rights require immediate and vigorous action.

"In regard to public nuisances, the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. . . . . In cases of public nuisances, . . . an indictment lies to abate them, and to punish the offenders. But an information also lies in equity to redress the grievance by way of injunction." Sto. Eq. Jur., *ss.* 921, 923. "In modern times, courts of law frequently interfere, and grant a remedy under circumstances in which it would certainly have been denied in earlier periods. And sometimes the legislature, by express enactments, has conferred on courts of law the same remedial faculty which belongs to courts of equity. . . . In neither case, if the courts of equity originally obtained and exercised jurisdiction, is that jurisdiction overturned or impaired by this change of the authority at law in regard to legislative enactments; for unless there are prohibitory or restrictive words used, the uniform interpretation is, that they confer concurrent and not exclusive remedial authority." Sto. Eq. Jur., *ss.* 80, 64 *i*. The wrongful flowage of a meadow by a millpond is a nuisance for which the injured party is entitled to damages for the past (recoverable in an action of trespass on the case), and an injunction for the future (obtainable on a bill in equity). Neither of his civil remedies would be taken away by a statute making the wrong a criminal offence, punishable, on

indictment, by fine and imprisonment. His right to specific relief on a bill in equity would not be affected by a further statutory provision authorizing the same relief in a criminal prosecution of the offender. *Wells* v. *Pierce*, 27 N. H. 503, 512, 513; *Alden* v. *Gibson*, 63 N. H. 12.

"When the plaintiff prevails in an action of tort for a nuisance, the court may, in addition to the usual judgment for damages and costs, enter judgment that the nuisance be abated and removed, and may award . . . a separate warrant to the proper officer, requiring him to abate and remove the nuisance at the expense of the defendant in like manner as public and common nuisances are abated and removed." Mass. Pub. St., *c.* 180, *s.* 1; *Codman* v. *Evans*, 7 Allen 431, 432. Notwithstanding this remedy at law, a bill in equity lies for an injunction against wrongful flowage. "Such an order and warrant could only be to abate and remove the nuisance. The nuisance or cause of damage is the flowage, and that is occasioned by the dam, sluices, and gates; and the nuisance might be abated by hoisting the gates, or removing the planks from a wasteway. These might be so easily replaced, that there would be a strong temptation to do it; and I know of no power to enforce the execution of the warrant after it is once executed. Whereas a decree in equity . . . may be effectual and perpetual. . . . It was contended in argument that the court would take jurisdiction of nuisances only in urgent cases, where the prompt interposition of the court is necessary, by immediate injunction, and where the proceedings at law would be too slow. But we think this is no test of superior efficacy and completeness of the remedy in equity." *Bemis* v. *Upham*, 13 Pick. 169, 171.

The abatement of a flowage nuisance by an injunction issued in an equity suit is a civil remedy, and not a punishment of a criminal offence. The legal character of the abatement does not depend upon the ownership of the property. If the land belongs to the state, the abatement of the nuisance is a relief of the plaintiff from future wrong, and not a penalty inflicted upon the defendant for the past. Neither does the legal character of the abating process depend upon the form of the action in which the injured party obtains redress. A prosecution under the bastardy act is a civil suit, although the procedure is mostly criminal. The object of the statute is to compel the defendant to indemnify the public and the mother of the child against expenses. *Castles* v. *Welch*, 63 N. H. 369; *Littleton* v. *Perry*, 50 N. H. 29–32; *Ford* v. *Smith*, 62 N. H. 419. Other statutes deal with him as a criminal. G. L., *c.* 274, *ss.* 1, 2, 4. He is not punished twice for one offence. In some cases of homicide an indictment has been used as a civil action for the recovery of compensation. G. L., *c.* 282, *s.* 14; *State* v. *M. & L. R. R.*, 52 N. H. 528, 548, 549.

On an indictment for larceny, when the defendant is convicted,

the owner of the stolen property is entitled to judgment and execution in common form against the convict for the value thereof, deducting the value of such part thereof as has been returned, with reasonable damages; and the defendant, if committed on the execution, has the same relief as if it had issued in an action of trespass. G. L., c. 278, s. 14. In such a case, the form of action is criminal, and the cause of action and the remedy are both criminal and civil, as they are when a judgment against the defendant on an indictment for nuisance is enforced by a mittimus punishing him for a wrong done before the indictment was found, and an abating process for the future specific and equitable relief of the injured party. *Reg.* v. *Stephens*, L. R. 1 Q. B. 702, 708, 709; 1 Bish. Cr. L., s. 1074. The public character of the injured party is not a constitutional ground on which the civil remedy can be refused.

In *State* v. *Crawford*, 28 Kans. 726 (an action to abate a liquor saloon, declared by statute to be a common nuisance), the court say (*pp.* 735, 736), "While it is unquestionably true that the keeping of the saloon in question is a criminal offence, and its operation involves the commission of many criminal offences, yet we cannot think that these facts can possibly take away any of the jurisdiction which courts of equity might otherwise exercise. It would seem to us that all sound reason and the great weight of authority is against the objection. . . . At common law, all public nuisances were public offences; and if the proposition is sound that no nuisances can be enjoined, except such as are not public offences, then, where the common law has full force, no public nuisance could ever be enjoined." *Littleton* v. *Fritz*, 65 Iowa 488, was an action upon a statute which provided that "Any citizen of the county where such [liquor] nuisance exists, or is kept or maintained, may maintain an action in equity to abate and perpetually enjoin the same." The constitutional reservation of the right of jury trial "secures the right," say the court (*pp.* 491, 494, 495), "in all cases in the trial of which a jury was necessary, according to the principles of the common law. . . . The jurisdiction of courts of equity to enjoin and abate nuisances is of very ancient origin. . . Such a case being of equitable cognizance, neither party could, at the time of the adoption of the constitution, demand a jury trial as matter of right. . . . One maintaining a nuisance may not only be punished in a criminal proceeding, but a civil action at law to recover damages in a proper case, and an action in equity to restrain the nuisance, may be prosecuted against him. . . . The defendant, in order to succeed in the defence that the proceeding by injuction is an attempt to enforce a criminal law by civil process, demands in effect that the courts must establish the principle that because the nuisance complained of is a crime, it is entitled to favor and protection in a court of equity. . . . There are many adjudged

cases . . . which expressly hold that the fact that a nuisance is a crime, and punishable as such, does not deprive equity of its jurisdiction to restrain and abate it by injunction."

*Carleton* v. *Rugg*, 149 Mass. 550, was a petition upon the Massachusetts liquor nuisance act of 1887, of which our law is a substantial copy. It was held that the act was constitutional; that the suit was not a proceeding to punish an offender for the crime of maintaining a nuisance; that the fact that keeping a nuisance is a crime does not deprive a court of equity of the power to abate the nuisance; and that the objection that the statute makes no provision for a trial by jury applied as well to nearly all legislation giving jurisdiction in equity. Three judges dissented, on the ground that statutes against the sale of intoxicating liquor had never been enforced by injunction in equity when the constitution was adopted; the legislature intended by the act of 1887 to provide a mode of punishing criminal violations of the liquor law without jury trial, and this purpose was inconsistent with the defendant's protection " by the judgment of his peers, or the law of the land."

*State* v. *Noyes*, 30 N. H. 279, was an indictment upon *c.* 245, Laws 1845, which provided that a bowling alley within twenty-five rods of a dwelling-house, store, shop, school-house, or place of public worship, should be taken and deemed to be a public nuisance. The defendant objected to judgment on the ground that the act was unconstitutional; that it did not authorize fine or imprisonment, but only an abatement of the nuisance; and that as the indictment contained no allegation that the nuisance continued to exist at the time the indictment was found, no judgment of abatement could be rendered. It was held that the act was constitutional; that for the statutory nuisance the defendant was punishable by fine and imprisonment at common law; that a judgment that the nuisance be abated could only be rendered where it was alleged and proved that the nuisance continued to the finding of the indictment; but that the omission of a sufficient allegation on that point did not impair the residue of the indictment. " It is not to be conceded," says *Bell*, J., delivering the opinion of the court (*pp.* 294, 295), " that places of gambling are not nuisances, in the proper and legitimate sense of the word. They are certainly nuisances of the worst kind, in the sense in which disorderly houses are so called. And at common law, keeping a gaming-house is a nuisance. . . . It may be said that a bowling alley is not of itself a nuisance, since it may either remain unused, or it may be used only as a place of innocent amusement; that its injurious character depends upon the improper use alone. But the legislature may well determine that an instrument which tends to facilitate vicious practices, is of itself an evil which ought to be prohibited."

Under the act of 1887, it is the use made of a liquor saloon that makes the building a nuisance, and the nuisance is abated by an

injunction against the use. *State* v. *Marston*, 64 N. H. 603, 604. If an act were passed authorizing an injunction against the crime of larceny, or against the violation of criminal law in general, it might be argued that punishment was the object of the act. It would hardly be contended that, for all purposes, every wrong can be made a common nuisance by legislation. "The legislature cannot do indirectly what it cannot do directly; it cannot change the nature of things by affixing to them new names." *Field*, J., in *Carleton* v. *Rugg*. 149 Mass. 550, 565. But it has not been shown that, for the suppression of nuisances, the power of the legislature to provide a civil remedy by injunction in equity is limited to such kinds of nuisance as had been invented when the constitution was adopted, or those that had been attacked in that way. "It is competent for the legislature to declare the possession of certain articles of property, either absolutely, or when held in particular places and under particular circumstances, to be unlawful, because they would be injurious, dangerous, or noxious; and by due process of law, by proceedings *in rem*, to provide both for the abatement of the nuisance and the punishment of the offender. . . . Putrifying merchandise may be stored in a warehouse, where if it remain it would spread contagious disease and death through a community. Gunpowder, an article quite harmless in a magazine, may be kept in a warehouse always exposed to fire, especially in the night: however secreted, a fire in the building would be sure to find it, and the lives and limbs of . . . firemen and citizens, engaged in subduing the flames, would be endangered." *Fisher* v. *McGirr*, 1 Gray 1, 27.

At common law, although gambling was not of itself unlawful (2 Bish. Cr. L., *ss*. 506, 532, *Reg.* v. *Ashton*, 1 E. & B. 286), common gaming-houses were nuisances. *King* v. *Dixon*, 10 Mod. 335; *King* v. *Rogier*, 1 B. & C. 272; *Lord* v. *State*, 16 N. H. 325. And so were houses of ill fame (Bac. Ab., Nuisance A, 1 Salk. 384, *Com.* v. *Howe*, 13 Gray 26, *McAlister* v. *Clark*, 33 Conn. 91, *People* v. *Rowland*, 1 Wheel. Cr. C. 286, *State* v. *Bailey*, 21 N. H. 343, *State* v. *M'Gregor*, 41 N. H. 407, *State* v. *Foley*, 45 N. H. 466), although fornication and adultery were offences cognizable only in the ecclesiastical courts. The doctrine of *Com.* v. *McDonough*, 13 Allen 581, 584, that keeping a house for the illegal sale of intoxicating liquor is not a nuisance at common law, may be open to question. In *Smith* v. *Com.*, 6 B. Mon. 21, it was held that keeping a house for such a purpose is a public nuisance. The court say,—"The habitual perpetration of the prohibited offences in a house kept for the purpose constitutes the house a public nuisance, as it tends in a greater degree to the spread of the evil which was intended to be prohibited by these enactments. There is a specific penalty for fornication and adultery; yet it is an offence and a much higher grade of offence to keep a bawdy house or a house where those practices are indulged. And though the single

offence [selling liquor] may be punished by a specific fine, the keeping of a house where those offences are habitually encouraged and indulged is an offence of a much higher grade, and is punishable as such by an indictment at common law." Bishop says that this doctrine, " though apparently new in the law, is truly as old as the law itself. A man who holds out inducements for people to congregate together and commit violations of a statute, not only lends the concurrence of his will to the wrongful acts, but also does what most powerfully tends to disrobe the body politic of her virtue and of the drapery of that order which the hand of the government has thrown around her, or if he thus draws people together that in their presence he may himself infringe a law of his country, he accomplishes likewise the same evil end." 2 Bish. Cr. L. (4th ed.) *vol.* 1, *s.* 1056. " The repeated, continuous, and persistent violations of the statute are what makes them [drinking saloons] nuisances, independent of the express terms of the statute declaring them to be such. . . . . Every place where a public statute is openly, publicly, repeatedly, continuously, persistently, and intentionally violated, is a public nuisance." *State* v. *Crawford*, 28 Kans. 726, 738.

Among the cases to which the constitution refers for information concerning use and practice, are general classes in which such general principles as the common law of nuisance had been established before 1784. This law is applicable to a great variety of wrongs, old and new, that have the essential qualities of a nuisance, and are appropriately dealt with as cases of the class to which they naturally belong. *Crowder* v. *Tinkler*, 19 Ves. 617, 623; 3 Bl. Com. 5, 216; 4 Bl. Com. 166; High Injunc., *ss.* 772–784; Wood Nuis., *cc.* 1, 5, 7, 13, 14–19, 21, 24, 25; Sto. Eq. Jur., *ss.* 920–929. If dynamite, carelessly deposited by its owner on his own land, in a farming town, should endanger the property and life of but one neighbor, the civil and private remedy of an injunction would not be withheld on the ground that such relief had never been given in such a case when the constitution was adopted. If the nuisance were public, the explosive being stored in the most populous part of Manchester, an injunction could not be refused on account of the greater amount of property and life exposed to danger. Whether the wrong was or was not a criminal offence in 1784 or 1889, the public would be entitled to the civil remedy provided by equity law.

If the sale of intoxicating liquor had never been, and were not now, a criminal act, and the statute had not alluded to the subject of nuisance, but had merely provided that the use of a building for the common sale of intoxicating liquor should be stopped by injunction on a bill in equity, there would be no ground for holding that the statute was enacted for the purpose of inflicting criminal punishment in a civil suit. And an illegal purpose cannot be judicially found in the act of 1887. It could have been passed in

its present form for the legal purpose of providing a civil remedy; and it would accomplish that object in the same manner and by the same civil process, whether it was made for that purpose, or with a design to enforce criminal law. The primary object was the suppression of a business that could be directly and constitutionally suppressed by civil process in civil suits. There was no occasion to abandon the direct mode of accomplishing that object, or to propose the use of civil process for the purpose of enforcing penal statutes. So far as such a design would be circuitous, it would be superfluous. Assuming that it would be fraudulent and illegal, and would invalidate the act, the only motive the legislature could have for entertaining it would be a desire to defeat the law they were attempting to make. There is nothing in the act that can overcome the presumption of constitutional intent. *Dow* v. *Norris*, 4 N. H. 16, 18 ; *Bell* v. *Glazier*, 13 N. H. 134, 138 ; *Kennett's Petition*, 24 N. H. 139, 141 ; *Colony* v. *Dublin*, 32 N. H. 432, 434 ; *Opinion of Justices*, 41 N. H. 555, 556 ; Cool. Con. Lim. 218–221, 257 ; Cool. Tax. 112. If this presumption could be set aside, there is no evidence or argument on which it could be found that the legislature preferred an illegal purpose to a legal one, in order to nullify their own work and shield a business which they regarded as a nuisance from the process they levelled against it.

"The judgment of his peers or the law of the land," in article 15 of the Bill of Rights, is synonymous with "the verdict of a jury or due process of law." *Mayo* v. *Wilson*, 1 N. H. 53, 55 ; Cool. Con. Lim. 430. By the common law, judgment may be given *per legem terrae* without the intervention of a jury in "all cases in the courts of equity . . . . any legal process which was originally founded in necessity, has been consecrated by time, and approved and acquiesced in by universal consent, must be considered an exception to the right of trial by jury, and is embraced in the alternative 'the law of the land.'" *State* v. *Allen*, 2 M'Cord 55, 59, 60. "Due process of law undoubtedly means in the due course of legal proceedings, according to those rules and forms which have been established for the protection of private rights." *Westervelt* v. *Gregg*, 12 N. Y. 202, 209. "It refers to certain fundamental rights which that system of jurisprudence, of which ours is a derivative, has always recognized." *Brown* v. *Levee Com'rs*, 50 Miss. 468, 479. "Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs." Cool. Con. Lim. 434. "It refers to that law of the land . . . . which derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions. . . . . Any legal pro-

ceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power in furtherance of the general public good, which regards and preserves these principles of liberty and justice, must be held to be due process of law." *Hurtado* v. *California*, 110 U. S. 516, 535, 537. It was held in that case that due process of law does not require an indictment by a grand jury in a prosecution by a state for murder. "A state cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the state courts affecting the property of persons must be by jury. This requirement of the constitution is met if the trial is had according to the settled course of judicial proceedings." *Walker* v. *Sauvinet*, 92 U. S. 90, 92, 93 ; *Kennard* v. *Louisiana*, 92 U. S. 480 ; *McMillen* v. *Anderson*, 95 U. S. 37, 41, 42 ; *Davidson* v. *New Orleans*, 96 U. S. 97, 104, 105 ; *Missouri* v. *Lewis*, 101 U. S. 22, 31. "It is a mistaken idea that due process of law requires a plenary suit and a trial by jury, in all cases where property or personal rights are involved. . . . . That kind of procedure is due process of law which is suitable and proper to the nature of the case, and sanctioned by the established customs and usages of the courts." *Ex parte Wall*, 107 U. S. 265, 289, 290.

*Kansas* v. *Ziebold*, 123 U. S. 623, 637, 638, 654, was a petition filed in a state court under section 13 of the Kansas act of 1885, which provided that "The attorney-general, county attorney, or any citizen of the county where such [liquor] nuisance exists, . . . . may maintain an action in the name of the state to abate and perpetually enjoin the same." The suit was removed into the circuit court of the United States, and was there dismissed. On appeal taken by the state, it was held (*pp.* 672, 673) that proceedings in equity, for the purposes indicated in the thirteenth section of the statute, are consistent with due process of law; and "as to the objection that the, statute makes no provision for a jury trial in cases like this one," the decision was that "such a mode of trial is not required in suits in equity brought to abate a public nuisance." The decree dismissing the bill was reversed, and the cause was remanded with directions to enter a decree granting to the state such relief as the statute authorized. A perpetual injunction, issued on a bill in equity for abatement without the verdict of a jury, was due process of law, because, at common law, such process, in such a case, did not require a jury trial.

*Eilenbecker* v. *Plymouth*, 134 U. S. 31, was a complaint filed in a district court of Iowa, for violation of an injunction issued in an equity suit on the liquor law. Notice being given, the complaint was tried upon affidavits by the court without a jury. The defendant was found guilty, and an alternative judgment imposing a fine of five hundred dollars, or imprisonment for three months, was affirmed by the supreme court of the state, whose judgment was affirmed by the supreme court of the United States. The

grounds of the defendant's objections were the criminal nature of the entire proceeding under the statute, excessive fine, cruel and unusual punishment, and trial by the court on affidavits, without a jury, without an indictment, without due process of law, and without the equal protection of the laws. It was held that the district court had power to issue the injunction, and that the proceeding on the complaint for violation of the injunction " is due process of law, and always has been due process of law." In the opinion, the court say (*p.* 40),—" If the objection to the statute is that it authorizes a proceeding in the nature of a suit in equity to suppress the manufacture and sale of intoxicating liquors which are by law prohibited, and to abate the nuisance which the statute declares such acts to be, wherever carried on, we respond, that, so far as at present advised, it appears to us that all the powers of a court, whether at common law or in chancery, may be called into operation by a legislative body for the purpose of suppressing this objectionable traffic; and we know of no hindrance in the constitution of the United States to the form of proceedings, or to the court in which this remedy shall be had. Certainly it seems to us to be quite as wise to use the processes of the law and the powers of the court to prevent the evil, as to punish the offence as a crime after it has been committed." See *Kidd* v. *Pearson,* 128 U. S. 1, 16; *Leisy* v. *Hardin,* 135 U. S. 100, 122, 123.

In this jurisdiction a complaint for the violation of an injunction, or other decree, is not ordinarily tried on affidavits if either party objects to such evidence; nor is it tried by jury. But in our present practice there is a jury trial in many cases in which it is not a constitutional right. *Tasker* v. *Lord,* 64 N. H. 279, 283. It is sometimes necessary to consider by what method of investigation, and by what tribunal, the rights of the parties will probably be most accurately and completely ascertained and adjusted. Some questions cannot be so conveniently handled by twelve jurors as by a smaller number; some cannot be adequately and properly settled with the means to which jurors are by custom restricted. *Davis* v. *Dyer,* 62 N. H. 231, 235, 236; *Bemis* v. *Upham,* 13 Pick. 169, 171. *C. R. Lumber Co.* v. *Olcott Falls Co.* (65 N. H. 290, 391) is a bill in equity for an injunction against the maintenance of a dam across Connecticut river without a suitable sluiceway for the passage of logs. If the question whether the dam in its present form is a nuisance by reason of the insufficiency of the sluice were submitted to a jury, and they found the dam a nuisance, the verdict would not inform the defendants what alterations should be made. If a trial is necessary, the interests of both parties require that the decision should specifically determine what sluice would be sufficient. A defective sluice may be no cause for demolishing the whole dam; and the case ought not to be tried upon a misleading issue. " On the question of the proper form, dimensions, and place of a sluice, the jurisdiction of equity is as plain

as in a partition of water-power between mill-owners, the ascertainment of lost boundaries, or the laying out of a private way. At the trial term the court can cause the log-way to be located and defined by a jury, and put upon them the duty of drawing a report containing a specification for the construction of the dam and sluice. But it has not been shown that the law of any country requires such work to be done by twelve unanimous persons."

In the present case, if the alleged use of a building is proved, the nuisance is to be abated by injunction. There is no occasion for the trial of any other issue than the simple one of use, and there is no legal reason why that issue should not be tried by jury. It is as properly determinable in that way as the question of fraud in such cases as *Tasker* v. *Lord.* The act of 1887, declaring the use of a building for either of several purposes to be a nuisance abatable in equity, does not introduce an exceptional mode of trial, or change the ordinary course of procedure on questions properly triable by jury (though not as a matter of constitutional right).

A nuisance cannot be abated, with or without legal process, if it has been discontinued, and has not been renewed when proceedings are begun against it. *State* v. *Noyes,* 30 N. H. 279, 298. A suit in equity is not commenced until the bill is filed. *Clark* v. *Slayton,* 63 N. H. 402. The statute does not authorize the maintenance of a suit, and the rendition of judgment, upon a cause of action that ceased to exist before the suit was brought.

*Case discharged.*

DOE, C. J., did not sit: the others concurred.